# CHARLESTON.

CALWELL v. CAPERTON'S ADM'RS.

| 27 | 397 |
| 43 | 521 |
| 27 | 397 |
| 47 | 307 |
| 27 | 397 |
| 52 | 355 |

Submitted January 14, 1886.—Decided February 6, 1886.

1. Where parties have made a settlement of their business transactions, such settlement is conclusive upon the parties thereto as to the correctness thereof in the absence of accident, mistake or fraud in making the same. (p. 408.)

2. The execution of a note or bond given by one of the parties to the other for the balance found due to him upon such settlement is conclusive upon all the items of the included account in such settlement in the absence of accident, mistake or fraud in making the same. (p. 408.)

3. A party to such settlement seeking to re-open the same on any of said grounds must distinctly allege and by clear and convincing evidence prove the particular facts, wherein such accident, mistake or fraud consists, and failing to do this, his bill will be dismissed. (p. 408.)

4. Upon a bill filed to re-open such settlement on the ground of accident, mistake or fraud the burden of proof rests upon the plain-

tiff to show the existence of the grounds alleged for re-opening the same, and not upon the defendant to show, that there is no error in such settlemet. (p. 409.)

5. A case, in which a petition filed in 1883, to re-open a settlement made in 1867, and another made in 1879, on the grounds of alleged mistakes therein, and to recover from the estate of a party to such settlement a large sum of money paid to it under such alleged mistakes, after all the parties engaged, concerned or interested in making the same, *except the plaintiff*, have been dead for many years—was dismissed by the Appellate Court. (p. 417.)

*J. W. Harris* for appellants.

*A. F. Mathews* for appellee.

WOODS, JUDGE:

On October 3, 1883, Bedford Calwell filed his petition against the administrators of Allen T. Caperton, in the circuit court of Monroe county, to settle his estate and to provide for the payment of his debts; alleging in substance, that on August 11, 1879, his brother, Lewis M. Calwell, then dead, was indebted to Allen T. Caperton, also then dead, a certain amount evidenced by two bonds by which all previous dealings and transactions between them had been adjusted and closed; one for $473.58, dated and due on September 13, 1875, amounting on August 11, 1881, to the sum of $641.69, and another for $1,823.00, not bearing interest or payable until the interest for which it was given, which had then accrued upon two White Sulphur bonds, transferred by Caperton to Calwell, which did not itself bear interest, should be collected by Calwell, or paid to any other person, and he filed, as parts of his petition copies of said bonds, marked respectively Exhibits "C." and "B;" that on August 11, 1879, he entered into an agreement in writing with one Stuart, a copy of which is made part of his petition as Exhibit "A.," whereby Stuart out of the proceeds of the sale of certain bonds transferred to him by petitioner, was to pay to the estate of Caperton $3,000.00 with interest from that date, when a certain bond should be collected; that this sum of $3,000.00 thus provided to be paid for his brother, Lewis M. Calwell to Caperton's estate was the amount estimated to be due, in the absence of evidence of his indebtedness, and

was deemed ample to pay all the liabilities of Lewis M. Calwell to Caperton's estate, and that this arrangement was made upon the express understanding and agreement, that before any part of the $3,000.00 should be paid the exact amount of this indebtedness should be ascertained, and that no more of the $3,000.00 should be paid than was really due; that Stuart on August 11, 1881, without ascertaining the amount actually due, or taking up the evidences of such indebtedness, paid to the administrator of Caperton $3,360.00, the amount agreed by him to be so paid with its interest. He further alleged that in the calculation of interest which resulted in the execution of the bond of $1,823.00, there was a mistake of $300.00, and that the same was endorsed by Caperton as a credit thereon, and that instead of $1,823.00, the bond should only have been executed for $1,523.00, and that the same did not become payable until March 31, 1882; that the amount due Caperton's estate on August 11, 1881 was only $2,018.42, and that the $3,360.00 paid by Stuart to Caperton's administrator overpaid the amount due from petitioner $1,251.58, which he prays may be repaid to him with interest from that date.   Petitioner's Exhibits "A.," "B." and "C." are as follows:

### Exhibit "A."

"Agreement, made this August 11, 1879, between Bedford Calwell, of the one part, and W. A. Stuart, of the other part, witnesseth:

That said Bedford Calwell, being the holder of a certain bond in the Singleton trust on the White Sulphur Springs property amounting to $5,000.00, with the accrued interest thereon, and with part of accrued interest on another bond in the hands of Dr. J. J. Moorman of the same amount ($5,000.00), the whole claim held by said Bedford Calwell amounting to $8,900.00 as of to-day, supposing that said Stuart's offsets just pay interest on said amount to this time, and the said Calwell has received of said Stuart $2,835.00 as of this day, and the said Stuart hereby binds himself to pay A. T. Caperton's estate $3,000.00 when said Singleton bond is collected, with interest from this date, to pay A. F. Mathews the amount of certain claims against Lewis M. Calwell on

which said Stuart is garnished, amounting as is supposed to $1,065.00, and the balance to pay said Bedford Calwell on one, two, three and four years, with interest from date; and William B. Calwell is to hold said Singleton bond as collateral security, and when this obligation is discharged or other security given, said W. B. Calwell is to turn the said security over to said Stuart.

"Witness the following signatures:

"BEDFORD CALWELL,
By W. B. CALWELL.
"W. A. STUART."

EXHIBIT "B."

"$1,823.00.

"There will be due from me to Allen T. Caperton the sum of $1,823.00, being the difference of interest —— *his bonds* which I hold and the interest on the two first mortgages on White Sulphur which he passed to me heretofore (in the year 1864) in discharge of his own bonds referred to above; and I promise to pay the above amount of $1,823.00 whenever the interest which has accrued upon the White Sulphur bonds referred to shall be collected by me or be paid to any other party.

"Given under my hand and seal May 16, 1867.

"LEWIS M. CALWELL, [SEAL.]"

EXHIBIT "C."

"$473.58.

"On demand I promise to pay to A. T. Caperton $473.58.
"Witness my hand and seal September 13, 1875.

"LEWIS M. CALWELL, [SEAL.]"

The administrators of Caperton answered the petition, referring to, and relying on the bond of $1,823.00 as a correct ascertainment of the amount due from Lewis M. Calwell to Caperton, upon the transaction therein referred to; they further aver that the sum of $1,823.00 was due to their intestate on May 16, 1867, and bore interest from that date, and that the bond merely intended to indicate the time and and mode of payment and not to limit the effect of the ascertainment then made of the difference of their mutual accounts, and that the same was so treated by the parties thereto; that Lewis M. Calwell and Caperton being both

dead, and the petitioner claiming the bonds assigned to Lewis M. Calwell by Caperton, and having assigned the same to Stuart on August 11, 1879, acting through his brother, William B. Calwell, who is also dead, entered into a written agreement with Stuart contained in Exhibit "A.," who in accordance with its provision paid to James F. Patton, a former administrator of Caperton $3,360.00, as stated in the petition, and that this sum was applied in payment of Caperton's debts. They deny that there was any mistake in the sum of $3,000.00 to the detriment of Bedford Calwell, or that the indebteness of Lewis M. Calwell was merely fixed at that sum in the absence of the bonds, in order to be certain that $3,000.00 would be sufficient to discharge the indebtedness to Caperton's estate; they rely upon the fact that the whole transaction from the beginning to the death of Lewis M. Calwell, was in great part conducted by said William B. Calwell, also dead, who was thoroughly familiar with the whole subject, had the mortgage bonds transferred by Caperton in his possession, drew up the the bond of $1,823.00 and who was one of the most practicable and astute business men in Greenbrier county. As all the parties to these transactions except the petitioner are dead, respondents can not tell how the sum of $3,000.00 was arrived at, nor do they know, and therefore they can not admit or deny that the interest accrued upon the bonds assigned by Caperton bore interest, nor do they know whether the two bonds of $1,823.00 and $473.58, constituted all the indebtedness due from Lewis M. Calwell to Caperton, but from their course of dealings they have reason to believe, and they thereupon deny that this was all that was due on August 11, 1879; and they deny that on that day, or at any time there was any understanding or agreement express or implied that any calculation was to be made, or any act done, to ascertain whether $3,000.00 was more or less than the amount due, for the parties were fully informed as to the matter, and they deny that Stuart or any one else has by any mistake, miscalculation or inadvertence paid to Caperton's estate more than was due to it. To this answer the petitioner replied generally, and the cause was referred to a commissioner, with instructions to enquire, ascertain and report:

"First.—The real amount of indebtedness of Lewis M. Calwell or his estate to the estate of A. T. Caperton on August 11, 1879, the date of the agreement between Bedford Calwell and W. A. Stuart filed as Exhibit "A." with Bedford Calwell's petition, and how said indebtedness is evidenced.

"Second.—The amount paid by W. A. Stuart under said agreement and on account of said indebtedness to the personal representative of A. T. Caperton and when paid.

"Third.—The amount by which said payment exceeds said indebtedness, in case it exceeds at all.

"Fourth.—All the facts relating to the indorsements on the bond of $1,823.00 of Lewis M. Calwell to Allen T. Caperton filed as Exhibit 'L. M. C.—1' with the answer of Caperton's administrator to said petition, when and by whom made, so far as they can be ascertained.

"Fifth.—Any other matter to be specially stated deemed pertinent by said commissioner, or required by any party."

On September 4, 1884, the commissioner completed his report, and on September 6, 1884, Caperton's administrators excepted to each and every part thereof, in effect, because the conclusions drawn by the commissioner were not supported by the evidence, and because the commissioner assumed as the basis of his report, that the burden of proof rested upon them to show that on August 11, 1879, Lewis M. Calwell was indebted to Caperton's estate $3,000.00, and not upon the petitioner to show that there was a mistake therein, and for other errors, which will hereafter be noticed. On October 7, 1884, the cause was heard upon the pleadings, former orders, &c., and upon the report of the commissioner and the exceptions thereto. On consideration thereof, the court was of opinion and decided that Bedford Calwell was entitled to the relief prayed for in his petition, by reason of over-payments alleged and shown to have been made by mistake of fact to the estate of A. T. Caperton on account of the indebtedness of Lewis M. Calwell to Caperton in his lifetime. And it appearing to the court from the first statement in said report of commissioner Withrow that such over-payment amounted as of August 11, 1879, to $1,195.36, and that it amounts now as of this date, principal and interest, aggregated to the sum of $1,421.42, and thereupon decreed that said first statement

in said commissioner's report be confirmed, and that all statements and exceptions inconsistent therewith be overruled, and that Bedford Calwell recover from the estate of A. T. Caperton, deceased, to be paid *pari passu* with other non-preferred creditors the said sum of $1,421.42, with interest thereon from the date of the decree, and his costs. The cause on March 20, 1885, was re-heard upon the petition of Bedford Calwell filed for that purpose and the foregoing decree was so far modified as to declare the said $1,421.42 a preferred debt against the estate of Caperton and decreed that it should be so paid.

From these decrees the administrators of Caperton have obtained an appeal with *supersedeas*, and they insist that the circuit court erred in decreeing that the sum of $1,421.42, or any part thereof was due from the estate of Caperton to the petitioner.

The order of reference was entered on June 28, 1884, and all the depositions except that of Stuart had then been taken and filed in the cause; that of Stuart was taken on August 27, 1884. Although the order of reference did not require the commissioner to return with his report the evidence before him in making up his report, yet it is apparent from the face of the report, that the evidence filed in the cause, contained all the proofs which were before him. This is rendered certain by the fact, that each and every part of the commissioner's report, was excepted to by said administrators, on the ground that all of the conclusions reached by him were unsupported by the evidence before it was returned to court and within two days after it was completed. Under such circumstances it was the duty of the commissioner to return such exceptions with his report, accompanied with the evidence which was before him touching the same, together with any remarks of his own which he might deem pertinent. The commissioner returned the exceptions with his report but made no remarks, and no special reference to the evidence which was before him. As the exceptions were taken to each and every part of the report, and to every conclusion contained therein nothing less than all the evidence, which was before him, on which he acted ought to have been

returned, which as already stated seems from the face of the report to have substantially been done.

What then are the facts appearing by the record in regard to this transaction? In substance they are as follows: Some time in the year 1864, Lewis M. Calwell held the obligations of Allen T. Caperton for large amounts of money, and Caperton held two of the first mortgage bonds on the White Sulphur, on which the accruing interest did not become payable until March 31, 1882. To discharge his own indebtedness, Caperton in 1864 transferred to Lewis M. Calwell, the two White Sulphur bonds. On May 16, 1867, they accounted with each other in regard to these bonds and ascertained, that the amount of the two mortgage bonds including interest accrued thereon to that date, exceeded the amount of Caperton's bonds held by Calwell, by the sum of $1,823.00 all of which was interest accrued on the mortgage bonds, and to secure the payment of this sum Lewis M. Calwell executed to Caperton exhibit " B." On September 13, 1875, upon the settlement of other matters of account between them of the date of December 1, 1867, Lewis M. Calwell executed to Caperton exhibit " C." On July 26, 1876, Caperton died, and on the last of March 1882, James F. Patton, one of his administrators, by whom the $3,360.00 paid by Stewart on August 11, 1881, was accounted for, also died ; and some time before August 11, 1879, (but how long before does not appear) Lewis M. Calwell died. On August 11, 1879, the petitioner Bedford Calwell, holding one and part of another bond on the Singleton trust on the White Sulphur Springs property of $5,000.00 each then amounting to $8,900.00—sold the same to Stuart, and bound him out of the price of these bonds to pay Caperton's estate $3,000.00 with interest from that date. The agreement between them in regard to this matter is set forth in exhibit " A." At the time this agreement with Stuart was made, no person representing the estate of Caperton was present or a party to it, or was informed of its provisions. Some time afterwards James F. Patton having been informed of this undertaking on the part of Stuart requested him to execute, and he did execute his bond for the $3,000.00 and its interest which he delivered to the said administrator of Caper-

ton, which was afterwards assigned to one of the creditors of Caperton, to whom Stuart on August 11, 1881, paid the same.   Stuart was examined as a witness on behalf of the plaintiff; and in reply to questions propounded to him answered:   " I had acquired a large amount of the bonds of the White Sulphur Springs in Greenbrier county of Mr. Wm. B. Calwell, secured in what was called the Singleton trust and among them were two of $5,000.00 each which up to the death of Lewis M. Calwell, were held, or the proceeds held for the benefit of his brother the said Lewis M. Calwell.   After the death of Lewis M. Calwell the amount represented by these bonds or a large part thereof, was held for Bedford Calwell.   At the time of the agreement, August 11, 1879, Mr. Wm. B. Calwell desired to realize money on a part of these bonds held by him for Lewis M. Calwell, and wished to provide a fund to meet a debt owing by said Lewis M. Calwell to said A. T. Caperton's estate.   Mr. Wm. B. Calwell acted in this matter for Lewis M. Calwell until the death of the latter, and then for Bedford Calwell.   It was under these circumstances that the agreement of August 11, 1879, was · executed in my room at the White Sulphur Springs, and no one was present except Mr. W. B. Calwell, and myself, and so far as I know no proof of the amount or evidence of the debt of Lewis M. Calwell to Caperton's estate was exhibited.   I paid to the assignee of Caperton's estate the $3,000.00 and its interest because I had undertaken to do so, at the instance of W. B. Calwell.   At no time were the evidences of the indebtedness to Lewis M. Calwell to Caperton, or to his estate exhibited to me, nor was any calculation made of their amount.   Of course no evidences of such indebtedness, or any of them were surrendered or delivered to me.

The plaintiff himself testified that he was not present when the agreement of August 11, 1879, with Stuart was made; that Wm. B. Calwell was present, and made the agreement, and signed the plaintiff's name thereto; that Wm. B. Calwell at that time had in his possession the Singleton bonds which had been assigned by Caperton to Lewis M. Calwell, and was familiar with the transactions and state of indebtedness between Caperton and Lewis M. Calwell, and that

Wm. B. Calwell made the arrangement for Lewis M. Calwell by which Caperton assigned to him the Singleton bonds, and also the arrangement with Stuart by which the agreement of August 11, 1879, was entered into, and that after he had made this agreement, Wm. B. Calwell had told him that he did not think Lewis M. Calwell's debt would amount to so much as $3,000.00 but to be sure of it, he put it at that; that he called the attention of said Patton administrator *to this fact, but he don't know whether it was before or after* Stuart paid the $3,000.00 and that Wm. B. Calwell is also dead."

Exhibit " B " is in the handwriting of William B. Calwell except the signature which is in the handwriting of Lewis M. Calwell. William B. Calwell is proved to have been a most cautious, careful and painstaking business man. Upon the back of exhibit " B," two indorsements had been made in the handwriting of Allen T. Caperton as follows, the first : " Credit by $300.00, mistake in calculating interest on W. S. bonds transferred in 1864. A. T. C." ; the second : "Upon further examination I find there is no mistake. A. T. C." The first indorsement had been partially erased, and the only other evidence touching these indorsements was the depositions of James M. Matthews and W. E. Leonard who were examined as experts. The former for thirteen years had been cashier, and the latter for four years, teller in the Bank of Lewisburg, and as such testified they had given more than ordinary attention to handwriting, difference in ink, &c., and being asked by plaintiff's counsel to examine the said indorsements on the back of exhibit " B," and say in whose handwriting they are; and at what time in your opinion was the first indorsement made, with reference to the time when the signature and seal " Lewis M. Calwell [—]" were affixed before, after or at the same time ? and at what time in your opinion was the second indorsement made, with reference to the time at which the first indorsement was made ? Was it before, after, or at the same time ? Mathews answered : " The indorsements are in the handwriting of Allen T. Caperton. I would *suppose* the first indorsement was made about the time the bond was executed, or very soon thereafter, and I would think the last indorsement was made some time after the first—how long it would be impossible to say."

Leonard answered: "I do not know the handwriting of the indorsements. I would suppose the first indorsement was made about the same time the note was drawn. I think the second indorsement was made at some time after the first." This testimony amounted to nothing more than what appeared on the face of the indorsements. No proof was offered of any other matters of account between Lewis M. Calwell and Caperton after the date of September 13, 1875, nor was there any other evidence of any mistake in the amount for which exhibit "B." was executed, or that on August 11, 1879, any less sum than $3,000.00 was due from Lewis M. Calwell's estate to that of Caperton. It was contended in the court below, and it is here insisted upon in argument by the appellee, that it devolved upon the appellants to prove that there was no mistake in the sum of $1,823.00 acknowledged by exhibit "B." to be due to Caperton by Lewis M. Calwell, and also to prove that on August 11, 1879, there was as much as $3,000.00 due to Caperton, and he insisted that the first indorsement on Exhibit "B.," though erased, entitled the plaintiff to a credit thereon of $300.00 and cited numerous authorities in support of the legal proposition, that such an indorsement is a part of the instrument itself and can not be erased except by consent of the obligee. The commissioner inclining to this opinion, but unwilling so to decide, stated the account in two aspects—in both of which he erroneously assumed, that the burden rested upon the appellants to show that there was no mistake in Exhibit "B.," and also to show what items of indebtedness of the estate of Lewis M. Calwell to the estate of Caperton entered into and composed the $3,000.00 procured by W. B. Calwell to be paid by Stuart.

In both statements made by the commissioner, he assumed that whatever amount was due on Exhibit "B.," it would only bear interest from March —, 1882, and that this amount, and the amount due on the bond of $473.58, together constituted the correct amount which was due from the estate of Lewis M. Calwell, to the estate of Caperton on August 11, 1879.

In his first statement, the commissioner allowed the credit of $300.00; in the second he disallowed it. By the former he

reported that on August 11, 1879, there was due from Lewis M. Calwell's estate to that of Caperton $2,164.64; by the latter $2,464.64; that by the first statement Caperton had been overpaid $1,195.36, and by the second $895.36, with interest from August 11, 1879, until paid. The circuit court adopted the first statement and decreed accordingly.

It is apparent from the evidence that on May 16, 1867, Lewis M. Calwell and Caperton, settled their accounts, involving large sums of money, and that the former fell in debt $1,823.00, all of which was for interest accrued and in arrear upon the two mortgage bonds of $5,000.00 each.which had in 1864, been transferred by Caperton to Calwell; and that Calwell to secure the payment thereof, executed to Caperton Exhibit "B." whereby he promised to pay the latter $1,823.00 whenever the interest which had accrued on said bonds "should be collected by him or be paid to any other party." It is equally clear, that the plaintiff on August 11, 1879, in the most deliberate manner, unsolicited by, and in the absence of all persons representing the estate of Caperton and so far as this record shows, without being in any manner bound to do so, acknowledged that there was due from the estate of Lewis M. Calwell to that of Caperton $3,000.00 and provided for the payment thereof, out of a fund which had been held by Wm. B. Calwell for the benefit of Lewis M. Calwell up to the time of his death. The plaintiff now seeks to avoid the effect of the settlement made on May 16, 1867, and of his own agreement made with Stuart on August 11, 1879, upon the grounds that by both of them, a larger amount was agreed to be paid, and was in fact paid to the estate of Caperton, than was due to it from Lewis M. Calwell. For the amount found due in the settlement of May 16, 1867, the bond of Lewis M. Calwell was executed; the amount specified in the agreement of August 11, 1879, the plaintiff himself procured Stuart to agree to pay, and without objection, he did pay $3,000.00 with interest from that date to the representative of Caperton's estate. The law is settled, that where parties have settled their accounts, and for the amount found due, upon such settlement a note or obligation has been executed to the other, by the party so found to be indebted, such settlement is conclusive

upon all the items included in such settlement unless by
some fraud or accident a mistake has been made therein;
and the party seeking to re-open such settlement on the
ground of such fraud, accident or mistake, must allege and
prove the particular facts wherein such accident, mistake or
fraud consists, and failing to do this his bill must be dis-
missed. It is incumbent on the plaintiff to distinctly allege
and clearly prove that such fraud, accident or mistake exists,
and not upon the defendants to show that the settlement is
right, for the law presumes the same to be correct until the
contrary is clearly made to appear. *Parkersburg Nat. Bank*
v. *Alls,* 5 W. Va. 50; *Manke* v. *Neal,* 23 W. Va. 57.

William B. Calwell had been the active, managing agent
in all these transactions, for Lewis M. Calwell, from 1864
until his death, and for the plaintiff, since, down to, and in-
cluding the agreement with Stuart on August 11, 1879,
and was "familiar with the transactions and the indebtedness
between A. T. Caperton and Lewis M. Calwell." He made
the arrangement with Caperton in 1864, whereby he pro-
cured him to transfer the two first mortgage bonds to Lewis
M. Calwell. At the settlement made between them on May
16, 1867, he wrote the body of the bond for $1,823.00 then
executed to Caperton for the balance found due from Lewis
M. Calwell; after the death of the latter, he made the ar-
rangement in the name of the plaintiff, which resulted in the
agreement with Stuart on August 11, 1879. He then had in
his possession the bonds which Caperton had assigned to
Lewis M. Calwell, and as it appears by the terms of the
agreement of August 11, 1879, Stuart had fully paid *all the
interest* which had accrued on these bonds, and also $1,100.00
upon the principal of one of them, leaving unpaid on that
day upon both of them, only the sum of $8,900.00. These
bonds had borne interest long before May 16, 1867, for on
that day $1,823.00 of interest then accrued and in arrear,
was due to Caperton, which Lewis M. Calwell promised to
pay, as soon as he could collect it, or as it should be paid to
any other party. Upon these two mortgage bonds, on
August 11, 1879, $7,341.66 of additional interest had
accrued, and this sum as well as the $1,823.00, and $1,100.00
of the principal, had been paid by Stuart. While it does

not appear exactly when or to whom these large amounts of interest were paid, yet from the testimony of the plaintiff and Stuart, it. is impossible to resist the conviction, that William B. Calwell, on August 11, 1879, when acting on behalf of the plaintiff in making the agreement with Stuart *knew when* this interest had been received, and that in fixing the amount due Caperton at $3,000.00, he acted with reference to the date when said interest was paid at which time by the term, of exhibit "B," the $1,823.00 became payable. If the plaintiff had clearly proved that no items of indebtedness of Lewis M. Calwell to Caperton, except those mentioned in exhibits "B" and "C" had been considered by William B. Calwell on August 11, 1879, in fixing the amount due to Caperton at $3,000.00, which he has wholly failed to do, it by no means follows that there was not as much as that sum then due to Caperton. The question would still recur, when did the bond for $1,823.00 in fact become payable? The bond itself answers, "when that much of the interest on said mortgage bond shall have been collected by Calwell or paid to any other party." This fact, the plaintiff ought to have known; it seems it was his interest as well as duty to learn it. William B. Calwell his agent, acting in. his name and stead, and on his behalf, in making the agreement with Stuart, knew it, and the plaintiff must be held to have also known it. From that agreement as well as from the testimony of Stuart, it is evident, that he was the holder of these mortgage bonds long before August 11, 1879, for he testifies that he had received them from William B. Calwell with a large amount of other similar bonds, and he knew that they "up to the time of the death of Lewis M. Calwell were held, or, the *proceeds* were held by William B. Calwell for the benefit of his brother Lewis M. Calwell, and that after the death of Lewis M. Calwell the amount *represented by these bonds*, or a large part thereof was held for Bedford Calwell."

The evidence of the time when this interest was paid, as well as the bonds themselves, and every indorsement appearing thereon, was within the plaintiff's reach for he proves by A. F. Mathews that these Singleton trust bonds were ultimately "payable out of the funds of the sale of the White Sulphur Springs, sold under a decree of the District Court

of the United States, and bought by said Stuart." Caperton survived the execution of exhibit " B " more than nine years; less than a year before his death, Lewis M. Calwell made a settlement of other matters of account between himself and Caperton, running from December 6, 1867, to July 1, 1875, resulting in the execution of the obligations of Lewis M. Calwell to Caperton for $473.58, and during all these years not a word of complaint is heard from either Wm. B. or Lewis M. Calwell, the only persons privy thereto or interested therein, of any error or mistake in either of these settlements; and not until long after Caperton, Lewis M. Calwell and W. B. Calwell, the only persons who had any personal knowledge of these transactions, were dead, do we hear any complaint, even from the plafntiff, whose agent, W. B. Calwell, had for him and in his name made the arrangements to pay the $3,000.000. To permit these transactions to be disturbed at this late day, upon testimony which, at the most, amounts to a mere possibility that there may have been mistakes made as to the exact amount actually due to Caperton's estate, would be almost tantamount to a withdrawal from the estates of decedents of the protection of law against the prosecution of stale demands, after all persons having personal knowledge of the facts are dead, and after all other evidence of the facts has been lost. But from a careful consideration of the facts in this case, it is highly probable, nay, almost certain that at least as much as $1,823.00 of the interest paid by Stuart on these two mortgage bonds was paid as early as March 10, 1874, and if so paid Caperton would have been entitled to said $1,823.00 and interest thereon from that date, which, together with the amount due on the obligation of $473.58, would, on August 11, 1879, have amounted to the sum of $3,000.00. But it is further insisted by the appellee that the first indorsement on the back of exhibit " B " is conclusive evidence that, to that extent at least, the settlement of May 16, 1867, was erroneous, and that by this indorsement the bond for $1,823.00 was, in legal effect, only a bond for $1,523.00, notwithstanding the second indorsement that " upon further examination there was no mistake," and that the first had been erased. What we have already said in regard to the evidence applies with equal force to these in-

dorsements. It is insisted in argument by the counsel for the appellee " that an indorsement upon a bond, placed there by the obligee, qualifying the same, however slightly, in favor of the obligee, is to be considered as incorporated in and made part of the bond, and such indorsement or credit can not be erased and thereby recalled, or in any way revoked, except by *destroying the bond*," and to sustain this proposition as thus announced, he has referred the Court to the following cases as authorities for that purpose : *Brook* v. *Smith*, Moor 679 ; *Burg* v. *Preston*, 8 Term R. 483 ; *Creig* v. *Talbott*, 9 Eng. C. L. R. 56 ; *Gordon* v. *Frazer*, 2 Wash. 130 ; *Shermer* v. *Beale*, 1 Wash. 11 ; *Price* v. *Kyle*, 9 Gratt. 247, and *Smith's Ex'or* v. *Spiller*, 10 Gratt. 318. The indorsement relied upon in this case, as having been incorporated in and made part of the obligation of Lewis M. Calwell to Caperton for $1,823.00, was neither a change in the amount of the bond, nor of the time or manner in which it was to be discharged ; it neither deferred or hastened the time of payment, nor is there the slightest evidence tending to show that this indorsement was made at the time of its execution, with the consent or in the presence of the obligor, or that he ever saw, or in any other manner had knowledge of its existence.

The indorsement did not purport to be for money paid, or for any valuable consideration received by or paid to Caperton in partial satisfaction of the debt of $1,823.00. It suggests that Mr. Caperton, at some time, and probably very soon after the settlement, having reviewed the calculations of interest on the several bonds settled in that transaction, supposed that he had discovered that a mistake of $300.00—in the calculation of interest had been made in his favor, indorsed on the back of the bond : "Credit by three hundred dollars mistake in calculating interest on W. S. bonds transferred in 1864. A. T. C." These bonds as we have seen were each for $5,000.00, and the supposed mistake must have been for only one year's interest on one of them, a mistake easily made and as easily corrected. The evidence on this point is still accessible to the plaintiff as his witness A. F. Mathews testified that the payment thereof, was provided for out of the proceeds of the White Sulphur Springs property, pur-

chased by Stuart, under the decree and proceedings of said suit in the District Court of the United States.

Under the circumstances surrounding and following the execution of the bond of $1,823.00, nothing would be more natural and reasonable than that Caperton should again examine the calculations, leading to its execution with still greater care, and finding there was no mistake, indorse that fact also upon the back of the bond as a truthful explanation of the reason, why he had erased the first indorsement. A less conscientious man, finding that no mistake had been made, would have erased the first, without making the second in explanation of the erasure. In the absence of all other evidence tending to show any such mistake, or that during the lifetime of Caperton Lewis M. Calwell and W. B. Calwell, any person having knowledge of this transaction, ever complained of any error in this settlement—such indorsement when erased must be considered, as if the same had never been made.

But is the legal proposition announced by the counsel for the appellee sustained by the authorities cited in support thereof? Is it true that this indorsement of the credit of $300.00, by mistake in the calculation of interest thereby was incorporated in, and became a part of the bond itself so, that if erased without the consent of the obligor, it " would destroy the bond ? " If the counsel for the appellee had relied upon the soundness of this legal proposition, he would not have been found contending for a credit of $300.00 but for the whole amount of the $1,823.00, for if the proposition be sound law, nothing could, or ought to have been collected therein as the erasure of the credit was deliberately made by Caperton in order to claim the whole amount of the bond. The earliest case referred to is that of *Brook* v. *Smith* in Moore, 679. The report of this case was not before us, but we find the substance of it stated by Lord Kenyon, delivering the opinion of the court of K. B. in the case of *Burg* v. *Preston* in 8 T. R. 483, wherein he says that in *Brook* v. *Smith, supra,* " the question was whether or not a memorandum indorsed on a bond before the execution of it, should be considered as explanatory of the intention of the parties respecting the operation of the condition of the bond. Popham, J., was clearly

of opinion that it should be so considered, it being a contemporary act; and although some of the judges at first doubted this they afterwards agreed with Popham."

The case of *Burg* v. *Preston, supra,* decided in 1799, was an action of debt on two bonds given by the defendant, the bankrupt, for £10,000 and £20,000 respectively. The defendant craved *oyer* of the condition of the bonds and of the memorandum annexed and subscribed to the writings obligatory. The condition was that the defendants should pay W. certain sums of money. The memorandum was, " The before mentioned W. hath given an undertaking not to bring any action or suit on the before-written bonds, or assign the same until after the death of the said Preston, and then pleaded that the said memorandum was written, annexed and subscribed to the bonds before the sealing and delivering thereof by him to the said defendant, and that the defendant is still living." To this plea there was a general demurrer and joinder. Lord Kenyon, C. J., delivering the opinion of the court in this case, said that it was the intention of the parties, that this indorsement should be taken as part of the condition of the bonds; that in this case the only question is, " what was the intention of the. parties ? and it appears to us that they intended that the obligor should not be called upon to pay this money during his lifetime, but that the payment thereof should be deferred until after his death," and judgment was entered for the defendant upon the demurrer.

The case of *Creig* v. *Talbot, supra,* was an action of debt upon a bond conditioned for the performance of an award to be made within a limited time. The declaration after setting out the condition of the bond, stated that before the time for making the award expired *all the parties to the bond by their deed* indorsed upon the bond agreed to give the arbitrators further time for making the award, and that the award was made within the extended time, and alleged non-performance of the award. Upon a demurrer to the declaration it was held that the action could be maintained upon the *bond* and the court of K. B. held that the plaintiff was entitled to judgment on the demurrer, the court being satisfied that the deed extending the time within which the award

might be made having been executed by all the parties to the bonds, it was the intention of the parties to vary the defeasance only, and to keep the bond in full force.

This case was decided upon the authority of *Evans* v. *Thompson*, 5 East 189. There the submission was by bond conditioned for the performance of an award to be made by a given time, and before the time expired the *parties* by an agreement indorsed on the bond consented to enlarge the time. The award was made within the enlarged time, but not within the time mentioned in the condition of the bond. In that case it was held that the agreement to enlarge the time was to be considered as virtually incorporating in it, by reference all the antecedent agreements between the parties relative to that subject, as if the same had been formally set forth and repeated therein.

*Shermer* v. *Beale*, 1 Wash. 11, decided in 1791 arose out of an arbitration bond, conditioned for the submission to arbitration of certain matters in controversy between the parties, and required the award to be returned by June 1, 1789. On May 30, 1789, an agreement signed by the parties, was indorsed on the arbitration bond authorizing the arbitrators by an indorsement on the bond to appoint any person they might choose to assist them in making their award ; the award to be ready to be delivered on June 20, 1789, the appointment of the assistant was duly made, and the award returned against June 20, 1789. Upon a controversy arising whether the award should be entered as the judgment of the court, it was held by the court of appeals that said indorsement is to be considered as incorporated with and is part of the condition of the bond so as to constitute one, entire agreement, and was to be taken by relation to the date of the bond.

The case of *Price* v. *Kyle*, 9 Gratt. 247 was in all respects similar to *Shermer* v. *Beale*, the indorsement in that case being executed under seal of the party extending the time within which the award might be made. *Goodman* v. *Frazier*, 2 Wash. *supra*, was an action of debt upon bond conditioned for the payment of tobacco to be inspected at certain places of inspection, and of a certain age. A memorandum was indorsed on the bond, that the bond might be discharged

by the payment of tobacco inspected at a different place of inspection, and of a different age. In this case the date of this indorsement does not appear, and the court of appeals evidently presumed it to have been made before or at least at the time the bond was delivered, and that the same thereby became part of it. In *Smith's Ex'or* v. *Spiller, supra,* the obligee at the time the $4,000.00 bond was executed before folding it up, at the desk where it was signed by the obligors wrote thereon the following indorsement:

"Memorandum.—If I do not collect the money due on the within note of my nephew Hickman Spiller during my life, then it is never to be collected, and I give it to him.

"Teste:                                     "FRANCIS SMITH."
      "A. FINDLAY."
"*September* 30, 1823."

This memorandum he signed and dated, and procured to be attested by a subscribing witness, and showed the same to the obligor. Not having been collected by the obligee in his lifetime, the bond with the indorsement but recently erased, passed into the hands of his executor who brought suit thereon to collect the same, which was defended upon the ground that not having been collected by the obligee in his lifetime, the bond at his death was by the terms of the indorsement, extinguished. Upon the testimony adduced on the trial, it was shown that the indorsement had not been placed there by the spontaneous act of the obligee, but was placed there by the *agreement of the parties,* and thereby became part of the bond, and the defendant had judgment. *Brown* v. *Copp,* 5 N. H. 346, was in all respects similar to that of *Creig* v. *Talbot, supra.*

*Stone* v. *Hansbrough,* 5 Leigh 422, was an action of ejectment brought by Hansbrough against Stone, to recover a parcel of two acres of land embraced within the boundaries, and formerly a part of a large tract of land conveyed to him by Dunbar. The tract had been conveyed by Beverly to Lewis, by Lewis to Washington, by Washington to Dunbar. At the foot of each of these several deeds, there was an indorsement, in the same words, made by the several grantors at the times when these several deeds were made, declaring that the two acres of land, claimed by the plaintiff were specially

reserved and set apart as a lot upon which to erect a church. These indorsements were held to be incorporated with and part of each deed, and the title to the two acres had not been conveyed to the plaintiff. It will be observed that in all of these cases—the indorsement was made either before or at the time of the execution of the bonds, or that the indorsements had been made by consent of the parties to the bonds, evidenced by a new deed executed by the parties and indorsed on the bond itself. None of these cases present, nor do any of them refer to any case which present the proposition sought to be established by the counsel for the appellee, that an obligee entering by mistake a credit upon a bond without the knowledge of the obligor may not, in the absence of all other evidence tending to show that the obligor is entitled thereto, erase such credit so entered by such mistake.

For these reasons we are of opinion, that the decrees of the circuit court of Monroe county entered upon the proceedings upon said petition on October 7, 1884, and on March 20, 1885, are erroneous, and must be reversed. And this Court now proceeding to render such decree as the said circuit court should have rendered, it is adjudged, ordered and decreed that the petition of Bedford Calwell be, and the same is hereby dismissed, and that said petitioner do pay to the administrators of Allen T. Caperton, deceased, their costs about their defence against the petition aforesaid in the circuit court of Monroe county expended. And it is further adjudged, ordered and decreed that the petitioner, Bedford Calwell, do pay to the appellants their costs by them about the prosecution of their appeal and *supersedeas* in this Court expended.

REVERSED.