# CHARLESTON.

BATSON v. FINDLEY.

52 343
58 252
58 568

52 343
60 657

Submitted June 12, 1902. Decided December 20, 1902.

1. NOTICE—*Receiver.*
   There must be notice of application for the appointment of a receiver in all cases of *ex parte* or vacation application, and in all cases pending the suit, before decree upon the merits, unless the bill prays for the appointment of such receiver, in which case it may be done in term as to real or personal estate without such notice. (p. 353).

2. ACCOUNTS—*Fraud—Mistake.*
   Settled accounts are deemed conclusive between the parties, unless fraud, mistake or omission is shown. (. 355).

3. ACCOUNT—*Mistake.*
   A bill to reform a settlement of accounts on the ground of mistake, and to correct such mistake, must allege the mistake distinctly and particularly, giving circumstances of mistake, showing wherein that mistake consists, and not be based upon mere general averments of mistake. (p. 355).

Appeal from Circuit Court, Taylor County.

Bill by John W. Batson against James W. Findley and others. Decree for plaintiff and defendant appeals.

*Reversed in part. Remanded.*

G. H. A. KUNST, for appellee.

IRA E. ROBINSON and DAVIS & DAVIS, for appellants.

BRANNON, JUDGE:

James W. Findley, being indebted to insolvency, executed a deed of trust conveying his real and personal property for the payment of various debts, among them three notes made by Findley to George W. Reynolds, which were given a priority over various other debts, being placed in the first class of the debts secured, and also to secure payment of certain notes made by Findley to Martin and Woods, commissioners, and a note made by Findley to Patrick, on which notes Reynolds was Findley's security, and which notes were placed in the second class. Batson, one of the creditors secured in the said deed of trust, whose debt was placed in the third class in order of security, brought a chancery suit in the circuit court of Taylor County, charging that the debts secured by said deed of trust to Reynolds were fraudulent, trumped up and fictitious, and that the provisions in the said trust for the payment and security of the said debts to Reynolds were made under confederation and connivance between Findley and Reynolds to defraud other creditors of Findley by securing and preferring in favor of Reynolds such false and fictitious debts. The bill charged that Reynolds owed Findley, and had money in his hands of Findley sufficient to pay the debts of Reynolds. A decree in the case held that Findley owed Reynolds nothing and those debts to be unfounded, fraudulent and fictitious as regards other creditors, denied them the preference given by the deed of trust, and declared that they should be postponed in payment to all other debts secured by said trust. From that decree Reynolds has appealed.

The said deed of trust having been made on the 30th of January, 1890, before our statute forbidding an insolvent to give a preference among creditors, it cannot be assailed merely because it gives Reynolds a preference; before that statute a

man had a perfect right to prefer one honest debt over another, though insolvent. Therefore, Batson's case must, for success, succeed in establishing that the debts secured to Reynolds are non-existent, false, fraudulent and fictitious. In passing on the question we must eliminate from consideration the fact that Findley was insolvent; for if those debts are just, then the insolvency of Findley is without any force in the case, as I sought to show in the case of *Herold* v. *Barlow,* 47 W. Va. 750, (36 S. E. 8.) I there gave the reasons for this position, the chief one being that if a man has a just debt against another, he may procure that other, though utterly insolvent, to give him a preference, even though that preference should leave none of the debtor's assets to go to other creditors. See *Shelby* v. *Booth,* 39 Am. R. 481. I have come to the conclusion, upon the evidence, that such evidence falls short of the establishment of the charge that the Reynolds debts are fictitious and fraudulent. It is useless and out of place to put into this opinion the evidence, or a detail of facts developed by that evidence, found in the voluminous record in this case. The constitution in requiring the reasons for our decision to be stated means only the legal reasons, the principles of law controlling the decision, as precedents for future cases, and does not intend that we shall load the reports with details of evidence differing in every case, constituting no precedents for future guidance.

Fraud is never presumed, but must be established by him who asserts it. He carries the burden and must make his assertion of fraud reasonably clear. Now, as to the three notes made by Findley to Reynolds dated 5th February, 1886, two of them, and the third dated January 1, 1890. These notes are before us. Both Findley and Reynolds swear positively that they were actually made on the dates they bear. As to the two dated 5th February, 1886, witness Curry says that he was present at a settlement of the large cattle and land transactions between Findley and Reynolds, and saw the settlement made on that date, and saw those two notes executed by Findley on the same piece of paper. His evidence is quite satisfactory as to this settlement and these notes. It would alone establish the execution of those notes at that date. Moreover, in the year 1886, F. M. Reynolds saw these notes. Further, McDonald saw them in 1887. Thus it is clear that those notes were not newly fabri-

cated at the late date of the deed of trust. This suit was not brought until 1895. It is clear that the notes are genuine and bear the true date of their execution. One of those two notes is for four thousand, eight hundred and twenty-dollars and eighty-six cents, the other for three thousand and twenty-nine dollars and sixteen cents; two notes being given because one of them was on a consideration touching some land, the other on other considerations, and Findley requested that the land transaction be put into separate note. Hence the two notes of the same date, payable at one day. The third note was for one thousand one hundred and five dollars and eighty-five cents. Those two notes of earlier date were given when no one dreamed that Findley was embarrassed, a circumstance tending strongly to negative the idea that they were fictitious. Had they been given very recently, there might be some pretext for saying that they were for a false debt. Were those two notes given for a fictitious consideration? Why shall we say so? Findley and Reynolds were large cattle dealers doing business together, buying, grazing and shipping large numbers of cattle, their transactions amounting to thousands of dollars. Reynolds was a man of large means and business experience. He furnished money for the purchase of cattle. Both Reynolds and Findley so swear, and it was this fact which brought Findley in debt to Reynolds on the settlement of the transactions of several years' dealing made in February, 1886, when the notes were given. Findley owned a good deal of land, and dealt very considerably in stock, and was regarded as solvent; but under the light revealed by passing time and clearly established in this case, Findley was always largely in debt, operating on borrowed money, buying land on credit, borrowing money out of bank. Having commenced on nothing, he was really never worth anything after payment of his debts. The fact that he borrowed large amounts of money from individuals and banks, bought land on credit, pursued the system of renewing and not paying his notes, some of his debts standing ten to fifteen years, unfailingly tell us that he was always hard pressed for money, and was worth little or nothing net. It is, therefore, highly probable, under all the light cast by the evidence in this case, that Reynolds, being a man of large means, but needing the co-operation of Findley in the cattle business, would and did furnish the

money needed for its prosecution. Both he and Findley so swear positively. I see nothing to contradict this position proven by the evidence of both of these men and other circumstances in the case. They lost money in stock dealings. The evidence is not of sufficient weight to prove these two notes as given for a false and fictitious debt. Those two notes covered the cattle transactions up to their date and a land transaction. When Findley, prior to this settlement some years purchased the Francis Findley farm, he was unable to pay the heirs for it, and Reynolds advanced for him large amounts of money to pay for it on the faith of the land being responsible for it. He as a witness, named the parties to whom he made payments and exhibited checks and papers to show such payments, and he exhibited the original memorandum of settlement, verified by the oath of himself and Findley. Curry sat in the room when this settlement was made February, 1886, and says that Findley acknowledged that Reynolds had paid moneys on the land, and owed Reynolds the balance shown by the two notes which he saw executed, and that Findley requested the land debt put in a note to itself, as expressed on its face. Both Findley and Reynolds swear that the debt represented by the notes was honest, and is unpaid. Findley and Reynolds kept on dealing together in stock thereafter, and the note of one thousand, one hundred and five dollars and eighty-five cents represents a settlement of such later transactions. The remarks above made as to the other notes largely apply as to this note. Notes given by one man to another on settlement of accounts between them running through years and years, covering large transactions, which all admit to have existed, and those notes and their consideration verified by the unqualified evidence of those two parties, cannot be overthrown in a court of justice by mere general charges of fraud, mere suspicion of foul play. The law requires certainty in such cases. As to those notes and settlements the evidence to overthrow them is inadequate and insufficient. We are to attribute some verity, some honesty, to the oaths of a debtor and a creditor sustaining these debts, in the absence of something tangible and substantial to the contrary. Reynolds had no knowledge of the trust till after it was made.

We have shown that those two notes of 1886 were made when no hint was in the country as to Findley's insolvency. Upon

the rehearing of this case, in a brief, their original existence is
admitted; but the charge is made that Reynolds had money
of Findley, and that those notes were paid; but that later, when
Reynolds and Findley came to machinate fraud, the notes were
given back to Reynolds. Of this there is charge, but no proof.
Now, that these notes were in 1886 executed there is no shadow
of doubt, and unless payment is shown, they are still a debt.
Batson must prove such payment. He has not done so. His
only hope for success is to show that Reynolds had in his hands
money of Findley. Where did he get it? It is charged that
Findley sold a farm to McDonalds and received a large amount
of money. So he did; but he paid large debts out of it. It is
charged that six thousand, sixty-eight dollars and forty-seven
cents of this land money went into Reynolds' hands. It is
clearly shown and it is not denied or attempted to be disproven,
that Findley had some years before this sale become in-
debted to Cornelius Reynolds, and gave the latter notes
for his indebtedness, and that on one occasion F. M. Reyn-
olds, a brother of George W. Reynolds, both children and
heirs of Cornelius, was at his brother's home in Taylor
County, and F. M. Reynolds, who lived in Mineral County,
learned for the first that by reason of those notes of Find-
ley to G. W. Reynolds, Findley was under a large debt in
addition to a debt of two thousand and two hundred dollars
principal, with a large accumulation of interest due his father's
estate, and he became uneasy about the debt to the estate of his
father, then dead, and he and G. W. Reynolds went to Findley's
home, and F. M. Reynolds demanded that the debt to his
father's estate be paid, and shortly Findley sold the farm to Mc-
Donald for thirteen thousand dollars, and out of the proceeds
he paid G. W. Reynolds as administrator of his father, 22nd of
January, 1887, three thousand, eighty-two dollars and eighty-
five cents in discharge of the debt to the estate of Cornelius
Reynolds. This beyond doubt, is not disputed. Reynolds
says he did not then know of the sale of the farm nor where
the money came from. There was for some time some talk
between them of Findley selling the farm to Reynolds, which
would account for indulgence by Reynolds; but McDonalds,
offered more and Findley sold without informing Reynolds, and
told McDonalds not to let him know the consideration. When

Reynolds later learned of the sale, having a note of Findley given for the money which Reynolds had paid for him, in acquiring that farm, he went to McDonalds to enquire about the sale, and learning there was still a balance of two thousand, two hundred and fifty-eight dollars and forty-seven cents of the purchase money in the hands of McDonalds, he demanded that it be paid to him, and it was paid to him and credited on the note of Findley to Reynolds for three thousand and twenty-nine dollars and sixteen cents on 19th September, 1887. As we know that Reynolds had this note for money paid on the farm it is plausible and probable that as it was sold he would want his money out of it, and just that he should get it. There was no injustice to creditors in this. There is no evidence whatever to show that Reynolds got any money from that farm save the two sums above accounted for. McDonalds says that the balance went into the hands of Findley and others to pay debts, but not to Reynolds, McDonalds specifies where it went. Reynolds and Findley both swear that the balance did not go to Reynolds; but this does not depend on their evidence only, because McDonald swears that he paid Reynolds only two thousand, two hundred and fifty-eight dollars and forty-seven cents, which Reynolds credited on said note of Findley to him, and McDonalds shows that all the balance of the purchase money was paid to others, not Reynolds, and about three thousand dollars to Findley, and we have seen that it was paid by Findley to pay the Cornelius Reynolds estate debt. It is plain, if human testimony can be acted on, that Reynolds has not any money but what is legally accounted for out of that farm transaction; and this failing as a source of the charge that he has money of Findley in his hands, the case fails; for that is the shibboleth of the claim that Reynolds had in his pocket money more than enough to pay Findley's notes.

It is charged that from their connection in buying and selling stock Findley had money in the hands of Reynolds on the ground that sales went to the credit of Reynolds in bank. The answer is, as above stated, that Reynolds was a man of means, Findley not, but always borrowing and pressed. It is shown by checks that Reynolds furnished Findley thousands of dollars, advanced him much money. Findley's chief relation in the so-called partnership in stock was that he grazed cattle

bought by Reynolds on his farms, and shared profits. Reynolds furnished all money to buy stock. They both swear this and checks and papers show it. Who swears to the reverse? We look in vain for such evidence. Did Findley have profits? A few items of profits in sheep in years before the settlement of Feburary, 1886, which resulted in those two notes of Findley to Reynolds; but those years, in the whole, brought both of them loss, heavy loss. It is proven in the case, and is a recollection of sadness, that those were years of disaster, in which many prominent, leading cattle buyers' and graziers in that cattle section went down into insolvency and ruin. Reynolds pocketed no profits of Findley in those dark years. It is charged that he did, but it is not proven. It is proven that he did not by the evidence of both of them. The burden is on Batson. Thus this source of money of Findley in the pocket of Reynolds fails also for want of proof, and is negatived by proof.

It is charged, as another item of Findley's money hidden by Reynolds, that Findley had fifty-two cattle in Randolph County grazing, and that Reynolds got their proceeds. When we come to the evidence, both Reynolds and Findley swear that these cattle were Reynolds' cattle, and Baker swears that he sold them to Reynolds and Reynolds paid him for them. Carper says he never grazed cattle for Findley, but he sold Reynolds cattle, and had no dealings with Findley. So this specification fails. The truth is, there is absolute want of evidence to sustain the charge that Reynolds had in his hands money of Findley to pay the latter's debts to Reynolds. The bill and the briefs abound in charges to that effect, but are not sustained. They are mere general charges, based on suspicion. The mere fact that these two men did business together, and were in somewhat close relation in that respect furnish the chief basis for this charge. It is suspicion, no more. We are asked to fix fraud on such suspicion merely, the evidence being wholly inadequate. These men had mere business relation. They are not close kin. It is going very far to ask a court to fix a flagrant fraud on so frail foundation. Reynolds and Findley were subjected to prolonged and vigorous cross-examination, and they are unequivocal in their denial of fraud, all fraud. It is only just to say that their account of the many transactions seems to be fair and candid.

Some evidence is given to the effect that Findley stated that Reynolds had money in his hands to go on his debts, and that the two thousand, two hundred and fifty-eight dollars and forty-seven cents paid Reynolds by McDonald was to be applied by Reynolds on certain of Findley's debts. How improbable when we know that Findley had furnished money, as shown by his checks, paying in large extent for the land sold McDonald and had Findley's note of 1886 for a larger sum than that showing on its very face that it was for money he had furnished Findley to pay on the farm. Would he not pay his own debt? And then McDonald dissipates this pretension when he tells us that Reynolds came to him to ask him if he had bought the farm of Findley, and when informed that he had, Reynolds told him he had a lien on it and demanded that what was yet in his hands be paid him on that account. It is part of the *res gestae* of that payment. Would he have done this, if he was receiving it to pay others? It is a strong circumstance against this pretension. Reynolds swears in confirmation of what McDonald says. So does Findley. But suppose Findley did say that the money was in Reynolds' hands to go on debts. How could that declaration affect Reynolds? Whether that statement was made by Findley before or after the deed of trust, it is unsworn and incompetent hearsay; and if made after, not admissible, because the declaration of a grantor after conveyance can not be given in evidence to affect the title of the grantee. *Crothers* v. *Crothers*, 40 W. Va. 169. Much reliance is staked on this incompetent evidence. Its truth is flatly denied by Findley.

Counsel argues that Reynolds took no account of the two notes of 1886 in a settlement made 1st January, 1890, when Findley gave Reynolds his note for one thousand one hundred and five dollars and eighty-six cents, the result of that settlement, and that this argues against those two notes. It is clearly shown that those two notes were the result of dealings for years prior to 1886, and the note of one thousand one hundred and five dollars and eighty-six cents, the result of settlement for years later. Why bring those notes into the later settlement? Those notes represented closed transactions. They spoke for themselves, and there was no need to include them in a new note, nor is it usual to do so, and compound them. It is also said, merely said, that Reynolds did not at

once enter on the land note of 1886 as a credit the money paid him by McDonald, and not until after the trust. There is no proof of this; but there is proof to the reverse. But what if he did not enter it till later when he went to release that much on the deed of trust. He gave it as a credit the true date.

After the deed of trust Reynolds demanded that Findley confess a judgment for his debts. This is charged as a circumstance against Reynolds. He says that he had no part in the execution of the trust, and was not present, nor did he know that it was going to be executed. So says Findley. Reynolds says that it was talked of in the country that he did not have those notes in the trust secured, and he wanted them filed in the clerk's office for public inspection. Besides, the credit on one of them of money paid by McDonald had not been given by Findley in the trust, and he wanted it to appear, and have a judgment for the true balance as others were suing. He was advised to do this by an attorney. What does this argue? It does not disprove the debt, nor impeach the trust. As a prudent man he might want this additional security. He told St. Clair when asked why he took the judgment that the reason was that those who filed the trust had omitted the credit and he wanted the records to show the facts. This tends to show fair intention, to allow large credit not publicly appearing.

Much stress is placed upon evidence of Davisson to the effect that Reynolds told him that Findley did not owe him anything, and that nobody would lose anything by Findley. Reynolds flatly denies this. Here are two reputable men in square contradiction. Both interested, because Davisson was surety for Findley on large indebtedness coming subsequent to that of Findley in the deed of trust. He desired Reynolds to be defeated in the suit. Davisson may have misunderstood Reynolds. Conversations are easily misunderstood. Starkie on Evidence does but express what we every day observe, that oral statements are often misunderstood, misrepeated and are the weakest of all evidence. Does it look probable when Reynolds had those notes? May be Reynolds, if he did say so, said so as an act of friendship for Findley to prevent Davisson from pressing him. People often decline to expose the indebtedness of friends. But I ask can a court upon such evidence alone, deny the existence of indebtedness by notes whose existence is

beyond doubt, proven by a party disinterested present at their date and execution, and seen by several parties years before?

As to the notes given upon the land sale by Findley, with Reynolds as a security, to Martin and Woods, commissioners, there can be no doubt. Reynolds paid them in bank. He paid the Patrick note of forty-five dollars. Why should they be denied to Reynolds? I answer they can be denied upon no other ground than upon the suspicion and charge that really Findley owed Reynolds on the whole nothing, or that Findley had money in Reynold's hands—mere general charges, but not proven charges. Reynolds in his answer stated that a judgment of Sarah Fenton, executrix of James P. Fenton, against James Burnside and Reynolds and Findley as sureties had been rendered, and that he had paid it, and that as it bound Findley he was entitled to charge half of it on Findley's land. It ante-dated the deed of trust. It was denied Reynolds by the decree. Reynolds is entitled to substitution for half of this judgment as of its date as a lien. The court erred in displacing these debts of Reynolds from their proper priority under said deed of trust and judgment.

By the said decree receivers were appointed to take charge of the property conveyed in the said deed of trust pending further proceedings in the case, awaiting the report of a commissioner. Appellant relies upon this appointment of receivers as error. I very decidedly concur with appellant's counsel in the proposition that the appointment of receivers is a harsh remedy, at least in many instances, and is somewhat abused by the courts, and that notice of the application for the appointment of receivers should be given. Sometimes the appointment of a receiver brings ruin to men. It is an enforcement of insolvency upon men who are really solvent, but who are destroyed by the mere appointment of a receiver. Therefore, the rule is that the power should be exercised very sparingly and very cautiously. But these principles do not apply to a case like this, where insolvency is patent, and where a party has voluntarily placed his property in a trustee for his creditors. He cannot complain that the court takes charge of property no longer his, virtually, but devoted by his own act as a fund for the payment of his creditors, which will likely prove inadequate to their payment. Where a debtor is insolvent, and there is a

suit pending before a court to apply his property to the pay-
ment of his debts, it is usual and proper to sequester the assets
by the appointment of a receiver, so that the creditors ·may
have the benefit of rents and profits pending the proceedings,
and thus prevent the debtor from wasting such rents and
profits. *Beard* v. *Arbuckle,* 19 W. Va. 145; *Ogden* v. *Chal-
fant,* 32 W. Va. 559.

It is complained that no notice was given of the application
for the appointment of a receiver. I again concur with coun-
sel for appellant in the statement that there exists, to some
extent at least, an erroneous practice of the courts of the ap-
pointment of receivers without prior notice. In every instance
before process served, and the application is thus *ex parte,* such
notice must be given, except in cases of emergency where it is
impracticable, else the appointment will be reversible. And
even after process served, during the pendency of the suit if
such application is made in vacation, there must likewise be
such notice; but there need be no notice when made in term
time in a decree on the merits. *Ogden* v. *Chalfant,* 32 W. Va.
559; *Ruffner* v. *Mairs,* 33 *Id.* 655. Where the bill prays for
the appointment of a receiver, it may be done any time after
the process is served, without further notice. *Wilson* v. *Mad-
dox,* 46 W. Va. 641. But whether or no the bill prays such
appointment, it may be made, in term without further notice,
in the decree on the merits. In *Hutton* v. *Lockridge,* 27 W.
Va. 428, it is held that no receiver of real estate or its rents and
profits can in any case be appointed without notice to the owner
or tenant. This was because of the statute of 1882, providing
that no receiver of real estate or its rents and profits shall be
made without notice to the owner or tenant. Code, chapter
133, section 28. That section, after giving the· broad power
for the appointment of receivers, contains the clause requiring
notice in the case of real estate. Does it mean to dispense with
it in other cases? I think not. It is troublesome to say what
the act means. I do not think it means to dispense with notice
in applications out of term, or in term, where the bill prays
no such relief; nor do I think it requires special notice of a
motion for a receiver where the bill prays such a relief, or of
appointment in a decree on the merits, where such appoint-
ment is properly a part of the relief. I do think that such

notice ought to be required for an order in vacation, or for an interlocutory order in term, preliminary to a decree on the merits, though this seems somewhat antagonistic to *Ogden* v. *Chalfant,* which itself logically conflicts with *Hutton* v. *Lockridge.* The appointment is good in this case for two reasons, one because the amended bill prays for the appointment, and the other because the decree is on the merits. But what right has Reynolds to complain of this appointment? He is not aggrieved by it. The appointment, in the eye of the law, preserves and promotes his interests.

Counsel for appellee, Batson, argues that the settlements between Findley and Reynolds do not show true balances in favor of Reynolds, because they were made upon an erroneous or mistaken basis. If such mistakes exist, being mistakes in the process of settling complicated transactions, they are not forcible to show intentional fraud. Where an account has been settled, balance struck, it is deemed conclusive between the parties, unless some fraud, mistake, omission or inaccuracy is shown. *Caldwell* v. *Caperton,* 27 W. Va. 397; *Curry* v. *Lawler,* 29 *Id.* 111. Such mistake may or may not exist in this case, but it is by no means clear that they do exist, the basis not apparent. Regarding it not cognizable, I am not prepared to express an opinion upon it. The bill is predicated solely upon the theory that the whole indebtedness in favor of Reynolds is false and fictitious, and is therefore a different theory from that of an erroneous or mistaken settlement. *Burley* v. *Weller,* 14 W. Va. 264. A bill to reform and correct an erroneous settlement must be directed specifically to that end; must allege the mistakes distinctly and particularly, for the reason that "jurisdiction for the correction of mistakes is exercised only in order that the real intention of the parties may be carried out; and if the particulars wherein there has been a failure to express correctly the intention of the parties are not pointed out, the court will have nothing to guide it in making the correction. The fact that the expression 'by mistake' is interspersed through the pleadings will not be sufficient to invoke the aid of equity where the particular circumstances constituting the mistake are not alleged." 14 Ency. Pl. & Prac. 43; *Caldwell* v. *Caperton,* 27 W. Va. 397. This bill does not comply with this law. The decree is reversed so far

as it adjudges and decrees that the said debts against James W. Findley claimed by George W. Reynolds are not valid and that the deed of trust in so far as it gives preference of payment to them, was executed by James W. Findley with the knowledge and desire of said Reynolds, with intent to hinder, delay and defraud the creditors of said Findley, and remits them to the foot of said deed of trust and directs them to be paid last from the sale of the trust property, and the cause is remanded for further proceedings according to the principles above stated.

*Reversed in part.   Remanded.*