519 S.E.2d 622

Cheryl Richardson DEVANE, Personal Representative of the Estate of Richard Walter Richardson, Plaintiff Below, Appellee,

v.

George KENNEDY, M.D., and Charles Town General Hospital, Inc., d/b/a Jefferson Memorial Hospital, Defendants Below, Appellees,

The West Virginia Insurance Guaranty Association, Appellant.

No. 25206.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 17, 1999.

Decided March 26, 1999.

James D. McQueen, Jr., Kathlene Harmon–McQueen, Glen A. Murphy, McQueen Harmon & Potter, L.C., Charleston, West Virginia, Attorneys for the Appellant.

William R. DeHaven, Martinsburg, West Virginia, Bertram M. Goldstein, Bertram M. Goldstein & Associates, Baltimore, Maryland, Attorneys for Appellee, Cheryl Richardson DeVane.

P. Gregory Haddad, Ancil G. Ramey, Steptoe & Johnson, Morgantown, West Virginia, Attorneys for Appellee, Charles Town General Hospital, Inc.

Jeffrey M. Wakefield, Michelle Marinacci, Flaherty, Sensabaugh & Bonasso, Charleston, West Virginia, Attorneys for Amici Curiae, West Virginia Hospital Association and Medical Assurance of West Virginia, Inc.

Harvey D. Peyton, Peyton, Parenti, Whittington & Fahrenz, Nitro, West Virginia, Attorney for Amicus Curiae, Jack Levine, M.D.

Cheryl Lynne Connelly, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, P.L.L.C., Huntington, West Virginia, Attorney for Amicus Curiae, National Conference of Insurance Guaranty Funds.

Michael J. Farrell, Tamela J. White, Paul T. Farrell, Jr., Farrell, Farrell & Farrell, L.C., Huntington, West Virginia, Attorneys for Amicus Curiae, Pleasant Valley Hospital, Inc.

DAVIS, Justice:

The appellant herein and intervenor below, the West Virginia Insurance Guaranty Association [hereinafter "WVIGA" or "the Association"], appeals from an order entered on January 21, 1998, by the Circuit Court of

Jefferson County enforcing a pre-insolvency settlement agreement entered into by Cheryl Richardson DeVane [hereinafter "Mrs. DeVane"], plaintiff below; George Kennedy, M.D. [hereinafter "Dr. Kennedy"], defendant below; and the Insurance Corporation of America [hereinafter "ICA"], Dr. Kennedy's professional liability insurer. The terms of the settlement anticipated a release, by Mrs. DeVane, of all claims against Dr. Kennedy and Charles Town General Hospital, Inc., d/b/a Jefferson Memorial Hospital [hereinafter "the Hospital"], codefendant below, in exchange for a payment of $220,000 by ICA. Following the insolvency of Dr. Kennedy's insurer, the WVIGA became liable for covered claims pending against ICA, including Mrs. DeVane's claim resulting from her settlement agreement therewith. As a result of the circuit court's order enforcing the settlement agreement and directing the WVIGA to pay Mrs. DeVane's claim, the WVIGA filed this appeal. The WVIGA asserts two errors, namely (1) that the nonduplication of recovery language contained in W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) requires the exhaustion of the Hospital's solvent insurance before Mrs. DeVane may recover from the WVIGA and (2) that the circuit court erred by enforcing the pre-insolvency settlement agreement against the WVIGA because the enforcement order constituted a non-binding stipulated judgment and because the Association did not participate in the settlement negotiations. Having reviewed the parties' arguments, designated record, and pertinent authorities, we conclude that the language of W. Va.Code § 33–26–12(1) requires, before resort may be had to the WVIGA, the exhaustion of solvent insurance only insofar as the claim asserted against the WVIGA is collaterally insured by such solvent insurance. We further conclude that the circuit court did not abuse its discretion in ordering the enforcement of the pre-insolvency settlement agreement, and requiring the WVIGA to satisfy ICA's obligation arising therefrom, because the enforcement order was not a stipulated judgment and because the WVIGA's nonparticipation in settlement negotiations does not constitute a valid defense to the settlement's enforcement. Accordingly, we affirm the decision of the Circuit Court of Jefferson County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The facts from which this appeal has arisen generally are not disputed by the parties. On July 2, 1990, Richard W. Richardson [hereinafter "Mr. Richardson" or "the decedent"] received medical treatment from Dr. Kennedy in the emergency room of the Hospital. The parties represent that, as a result of such medical treatment, Mr. Richardson died. Thereafter, the decedent's personal representative filed a civil action in the Circuit Court of Jefferson County, on December 10, 1992, alleging medical malpractice by Dr. Kennedy[1] and ostensible agency and vicarious liability of the Hospital.[2]

1. The professional negligence with which Dr. Kennedy was charged was described in paragraph 5 of the Complaint:

 On Monday, July 2, 1990 at approximately 11:24 o'clock a.m., Richard Walter Richardson arrived at the emergency room at Jefferson Memorial Hospital complaining of chest pains. After examination, Defendant Dr. George Kennedy, M.D., advised Mr. Richardson that he thought his pains were the result of his diet, that he should refrain from eating greasy foods and caffeine and that he should go home and take a few days off from work. When Mr. Richardson was preparing to leave the hospital, he advised Dr. Kennedy that the chest pain was recurring. He was given Maalox and sent home. At approximately 4:00 o'clock P.M. that afternoon, Cheryl Richardson returned home from her employment to find her hus-

band lying on the floor unconscious and unresponsive. She immediately called emergency services who, upon arrival, began resuscitation attempts. All attempts to revive Mr. Richardson failed and he was pronounced dead at City Hospital, Martinsburg, West Virginia at 5:25 o'clock P.M. on July 2, 1990, from that which is commonly made reference to as a heart attack.

2. After the filing of the complaint, but before the case's settlement resulting in this appeal, the Circuit Court of Jefferson County dismissed the complaint, ruling that the named personal representative of Mr. Richardson's estate, Joseph Richardson, brother of the decedent, did not have standing to file this lawsuit as he was not the real party in interest. On July 5, 1996, this Court reversed the circuit court's order of dis-

At the time of Mr. Richardson's treatment in the Hospital's emergency room, Dr. Kennedy was employed by the Hospital as an emergency room physician and as the director of emergency services. His employment contract with the Hospital designated him as an "independent contractor" and required the Hospital to provide him with medical malpractice insurance coverage for his medical services rendered at the Hospital in this capacity. To satisfy the provision of insurance requirement, the Hospital assumed payment of Dr. Kennedy's medical malpractice insurance premiums for his policy of such insurance through ICA.[3]

During the course of litigating the civil lawsuit, counsel for Mrs. DeVane, widow of Mr. Richardson and administratrix and sole beneficiary of his estate, and counsel for Dr. Kennedy and his insurer, ICA,[4] entered into a settlement agreement.[5] On February 20, 1997, the parties memorialized this compromise in writing. The terms of the settlement agreement provided that Mrs. DeVane would release all of her tort claims against Dr. Kennedy and the Hospital, thereby surrendering her right to pursue further litigation against those parties in this matter. In exchange, Dr. Kennedy, through his medical malpractice insurance, agreed to pay Mrs. DeVane $220,000.[6] Shortly thereafter, on March 12, 1997, Dr. Kennedy's malpractice insurer, ICA, was declared to be insolvent by the District Court of Travis County, Texas. The Texas court then placed ICA into receivership for the commencement of liquidation proceedings on April 28, 1997.[7] As a result of ICA's insolvency and resultant liquidation, the WVIGA assumed responsibility for those claims for benefits filed against ICA by West Virginia residents, including the claim of Mrs. DeVane resulting from the February 20, 1997, settlement agreement with Dr. Kennedy. *See* W. Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol.1996).[8]

missal and reinstated the estate's causes of action to permit Mrs. DeVane, the decedent's widow and the sole beneficiary of his estate, to qualify as the real party in interest. *Richardson v. Kennedy*, 197 W.Va. 326, 475 S.E.2d 418 (1996). Thereafter, on October 21, 1996, the County Commission of Jefferson County named Mrs. DeVane administratrix of the decedent's estate, causing her to be substituted for Joseph Richardson as the real party in interest in this matter.

3. At the time of his employment contract with the Hospital, and the Hospital's assumption of his professional insurance premiums, Dr. Kennedy had medical malpractice insurance with limits of $1,000,000/$3,000,000, "claims made," through ICA. Subsequently, in approximately 1996, ICA became a subsidiary of the P.I.E. Mutual Insurance Company [hereinafter "PIE"]. To avoid confusion, however, we will hereinafter use the appellation "ICA" to refer to the provider of Dr. Kennedy's professional liability insurance.

Also at the time of Dr. Kennedy's contract of employment, the Hospital was separately insured through a policy of liability insurance issued by the West Virginia Hospital Insurance Company. Thereafter, Medical Assurance of West Virginia, Inc., acquired the West Virginia Hospital Insurance Company. For ease of reference, the Hospital's insurers will be collectively referred to as "Medical Assurance."

4. The parties represent that, as a subsidiary of PIE, ICA was authorized to represent Dr. Kennedy in settlement negotiations with Mrs. DeVane.

5. Neither the Hospital nor its counsel participated in the settlement negotiations. Consequently, while the Hospital received the benefit of Mrs. DeVane's release of her claims asserted against all defendants, including the Hospital, the Hospital maintains that because it was not an actual party to the settlement, it is not technically bound by the settlement terms, and the settlement cannot be enforced against it. Mrs. DeVane concedes that she cannot enforce her settlement with Dr. Kennedy and ICA against the Hospital.

6. The February 20, 1997, correspondence by Charles F. Printz, Jr., counsel for ICA and Dr. Kennedy, which confirmed, in writing, the settlement terms, provided in relevant part:

To confirm the settlement reached yesterday, February 19, 1997, as a result of negotiations with Bert Goldstein, this case has been resolved for the sum of $220,000, which will be paid to Cheryl DeVane, Administratrix, and yourself [William R. DeHaven, counsel for Mrs. DeVane] in exchange for a full and complete release of all claims against Dr. Kennedy and Jefferson Memorial Hospital and the approval of an order dismissing the case against both defendants with prejudice.

7. Likewise, PIE, which became the parent company of ICA in 1996, also was declared insolvent and was placed into receivership on March 23, 1998, by the Franklin County, Ohio, Court of Common Pleas.

8. W. Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol. 1996) mandates that the WVIGA shall:

Be obligated to the extent of the covered claims existing prior to the determination of

The West Virginia Insurance Guaranty Association is a "nonprofit organization created and designed to help alleviate the financial burden [borne] by citizens of this State when their insurance carrier[s] cannot fully satisfy their contractual obligations due to insolvency." *Cannelton Indus., Inc. v. Aetna Cas. & Sur. Co. of Am.*, 194 W.Va. 203, 207, 460 S.E.2d 18, 22 (1994). *See also* W. Va.Code § 33–26–6 (1970) (Repl.Vol.1996) (creating and describing functions of WVIGA). In other words, the WVIGA is charged, by statute, with the payment of claims that have been filed against insurance companies which are insolvent when such claims are filed, or which subsequently become insolvent before such claims have been paid. W. Va.Code § 33–26–2 (1970) (Repl.Vol.1996); W. Va. Code § 33–26–6; W. Va.Code § 33–26–8(1)(a); *Cannelton*, 194 W.Va. at 206–07, 460 S.E.2d at 21–22.[9]

The WVIGA receives its resources to fulfill the claims obligations of insolvent insurers by collecting monies from all insurance companies that write insurance in the State of West Virginia. W. Va.Code § 33–26–8(1)(c) (1985) (Repl.Vol.1996) (requiring WVIGA to "[a]llocate claims paid and expenses incurred among the two accounts separately, and assess member insurers separately for each account amounts necessary to pay the obligations of the association ... and other expenses authorized by this article"; limiting such assessments so that "[n]o member insurer may be assessed in any one year on any account an · amount greater than two percent of that member insurer's net direct written premiums for the preceding calendar year on the kinds of insurance in the account"). These assessments are ultimately derived from the premiums paid by the insureds of these member insurers. W. Va. Code § 33–26–16 (1970) (Repl.Vol.1996) (authorizing member insurers to set rates and premiums in such an amount to "recoup a sum equal to the amounts paid to the association by the member insurer less any amounts returned to the member insurer by the association"). Under the circumstances arising from ICA's insolvency, the WVIGA ordinarily would assume payment of ICA's obligations arising from claims made under the insurance policies of its insureds. *See* W. Va.Code § 33–26–8(1)(a).[10]

insolvency, and for such claims arising within thirty days after the determination of insolvency, but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars and is less than three hundred thousand dollars. In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligations of the insolvent insurer under the policy from which the claim arises. Notwithstanding any other provision of this article, a covered claim shall not include any claim filed with the guaranty fund after the final date set by the court for the filing of claims against the liquidator or receiver of an insolvent insurer, nor shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of an insolvent insurer, be binding against the association.
*See also* W. Va.Code § 33–26–5(4) (1985) (Repl. Vol.1996) (defining "covered claim" as "an unpaid claim ... which arises out of and is within the coverage of an insurance policy to which this article applies and which policy is in force at the time of the occurrence giving rise to such unpaid claims if (a) the insurer issuing the policy becomes an insolvent insurer after the effective date of this article [May 12, 1970] and (b) the claimant or insured is a resident of this state at the time of the insured occurrence, or the property from which the claim arises is permanently

located in this state"); W. Va.Code § 33–26–5(5) (1985) (Repl.Vol.1996) (explaining meaning of "insolvent insurer" as including "an insurer (a) licensed to transact insurance in this state either at the time the policy was issued or when the insured event occurred and (b) *against whom an order of liquidation with a finding of insolvency has been entered by a court of competent jurisdiction* in the insurer's state of domicile or of this state" (emphasis added)).

9. Pursuant to W. Va.Code § 33–26–6 (1970) (Repl.Vol.1996), the WVIGA is comprised of two separate and distinct funds, "[t]he automobile insurance account" and the "other" account, which encompasses all nonautomobile insurances except for health, "life, title, surety, disability, credit, mortgage guaranty, ocean marine, and workers' compensation insurance," W. Va. Code § 33–26–3 (1991) (Repl.Vol.1996). *See also* W. Va.Code § 33–26A–1, *et seq.* (creating West Virginia Life and Health Insurance Guaranty Association); W. Va.Code § 33–26B–1, *et seq.* (establishing West Virginia Health Maintenance Organization Guaranty Association).

10. Payments made by the WVIGA to individuals having claims against insolvent insurance companies are limited by the policy limits of the subject insurance policies and by the statutory cap for the payment of such claims by the Associ-

However under the facts of the instant appeal, the WVIGA disputed its liability for ICA's obligation arising from its pre-insolvency settlement agreement with Mrs. DeVane and refused to tender the $220,000 settlement amount. Following the declaration of ICA's insolvency, Mrs. DeVane's claim, *i.e.,* the settlement agreement, was forwarded to the WVIGA on approximately March 31, 1997. Having received no payment thereon, from either the WVIGA or ICA's liquidated estate, she moved the circuit court to enforce the settlement on November 25, 1997.[11] A hearing was held on Mrs. DeVane's motion on December 23, 1997, and, by order entered January 21, 1998, the circuit court ruled as follows: [12]

1. That this case was settled between the Plaintiff [Mrs. DeVane] and Dr. Kennedy for the sum of $220,000.00;

2. That this settlement pre-dated the insolvency of Dr. Kennedy's insurer, ICA;

3. That this settlement is fair and reasonable;

4. That this settlement is hereby enforced;

5. That West Virginia Code, Section 33–26–1, et. seq., is designed, in part, to protect the insured of an insolvent carrier;

6. That this settlement is a covered claim under Article 26, West Virginia Insurance Guaranty Association Act, Sections 33–26–1, et seq., and in particular, Section 33–26–5(4);

7. That Jefferson Memorial Hospital's duty to maintain insurance coverage for Dr. Kennedy, under Dr. Kennedy's May 16, 1990 contract with the hospital, was satisfied by the hospital's payment of premiums under Dr. Kennedy's policy with ICA;

8. That no other insurance coverage exists to satisfy the settlement agreement;

9. That this settlement is enforced against the West Virginia Insurance Guaranty Association, and the West Virginia Insurance Guaranty Association is ordered to pay $220,000.00 to the Plaintiff; and

10. That Dr. Kennedy's release of personal liability for the settlement shall be determined by operation of law, but in no event shall Dr. Kennedy be personally liable so long as the settlement agreement is in force and payment is made pursuant to the settlement agreement.

The circuit court announced further that "there is no just reason for delay" and directed that its Final Order Enforcing Settlement "be entered as a judgment." [13]

ation. W. Va.Code § 33–26–8(1)(a) (restricting WVIGA's obligation on covered claims asserted against insolvent insurers to "include only that amount of each covered claim which is in excess of one hundred dollars and is less than three hundred thousand dollars. In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligations of the insolvent insurer under the policy from which the claim arises.").

11. On September 16, 1997, the circuit court granted a stay of the proceedings for six months, retroactive to the date of the April 29, 1997, Texas court order placing ICA in receivership. *See* W. Va.Code § 33–26–18 (1985) (Repl.Vol. 1996) ("All proceedings in which the insolvent insurer is a party or obligated to defend a party in any court in this state shall be stayed for six months from the date the proof of claims provided for in section eighteen [§ 33–10–18], article ten of this chapter is filed with the receiver to permit proper defense by the association of all pending causes of action....."). This stay expired on October 29, 1997. *See id.* The order imposing the mandatory six-month statutory stay indicates that the WVIGA was notified of this ruling.

12. The WVIGA neither appeared at the December 30, 1997, hearing culminating in this order nor filed any written objections to the circuit court's entertainment of said motion. From the record of the motion to enforce settlement and hearing thereon, it appears that the WVIGA did not receive notice of these proceedings. Nevertheless, counsel for the WVIGA, during the oral argument of this case before this Court, acknowledged that while the Association did not receive formal notice of the motion or motion hearing, it did have knowledge of the proceedings.

13. The court's order enforcing the settlement entered into by Mrs. DeVane, Dr. Kennedy, and ICA was directed to be sent to the WVIGA.

After the entry of the circuit court's order, the WVIGA, on March 2, 1998, moved to intervene, as authorized by W. Va.Code § 33–26–18 (1985) (Repl.Vol.1996) [14] and Rule 24(a) of the West Virginia Rules of Civil Procedure,[15] for the purpose of requesting the court to set aside its ruling. The circuit court granted the WVIGA's motion to intervene on March 27, 1998, but held that the Association "shall be bound to the appeal period [applicable to the court's January 21, 1998, order] established under West Virginia Rules of Appellate Procedure Rule 3(a) which will run on May 21, 1998." The WVIGA then timely filed its petition for appeal, which this Court granted on July 7, 1998.

## II.

### STANDARD OF REVIEW

■ In this appeal we are asked to resolve the disparate meanings ascribed by the parties to W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) and to evaluate the propriety of the circuit court's order enforcing the settlement among Mrs. DeVane, Dr. Kennedy, and ICA. When the issue on appeal concerns a question of law or the interpretation of a statute, we apply a *de novo* standard of review. Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). *See also* Syl. pt. 1, *Shawnee Bank, Inc. v. Paige*, 200 W.Va. 20, 488 S.E.2d 20 (1997) (" 'Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.' Syllabus point 1, *Appalachian Power Co. v. State Tax Dep't of*

*West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995).").

■ Moreover, when this Court undertakes the appellate review of a circuit court's order enforcing a settlement agreement, an abuse of discretion standard of review is employed. *See* Syl. pt. 7, in part, *Smith v. Monongahela Power Co.*, 189 W.Va. 237, 429 S.E.2d 643 (1993) ("The determination of whether a settlement has been made in good faith rests in the sound discretion of the trial court...."). The reason for this deferential standard is that " '[b]oth law and equity favor repose of litigious matters. Compromise by parties of their differences is favored by all courts. When a matter has thus been put at rest, it should not be disturbed except for grave cause.' " *Sanders v. Roselawn Mem'l Gardens*, 152 W.Va. 91, 104, 159 S.E.2d 784, 792–93 (1968) (quoting *Janney v. Virginian Ry. Co.*, 119 W.Va. 249, 252, 193 S.E. 187, 188 (1937)).

Having enunciated the standards of review applicable to this appeal, we proceed to the errors asserted by the WVIGA.

## III.

### DISCUSSION

The WVIGA bases its appeal to this Court upon two assignments of error. First, the WVIGA contends that W. Va.Code § 33–26–12(1) requires the exhaustion of all policies of solvent insurance before a claimant may request from the Association proceeds of an insolvent insurance policy. Accordingly, the WVIGA maintains that the Hospital's policy of insurance with Medical Assurance is such a source of solvent insurance. Thus, the

---

**14.** W. Va.Code § 33–26–18 states, in pertinent part, that:

As to any covered claims arising from a judgment under any order, decision, verdict or finding based on the default of the insolvent insurer or its wrongful failure to defend an insured, the association either on its own behalf or on behalf of such insured may apply to have such judgment, order, decision, verdict or finding set aside by the same court or administrator that made such judgment, order, decision, verdict or finding and shall be permitted to defend against such claim on the merits.

**15.** Rule 24(a) of the West Virginia Rules of Civil Procedure, discussing "[i]ntervention of right," directs:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this State confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

WVIGA urges, Mrs. DeVane must first assert her covered claim against the Hospital's insurer before she may request the Association to pay her claim on ICA's behalf. Second, the WVIGA argues that the circuit court erroneously enforced the settlement reached by Mrs. DeVane, Dr. Kennedy, and Dr. Kennedy's insurer, ICA, prior to ICA's insolvency. Rather, the Association suggests that it is not bound by the terms of this settlement because the enforcement order constituted a non-binding stipulated judgment and because it was not a party to the settlement negotiations. Therefore, complains the WVIGA, the circuit court erred in enforcing the settlement against it.[16]

### A. W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996): Nonduplication of Recovery

■ The first issue raised by the WVIGA concerns the meaning and effect of the nonduplication of recovery section of the West Virginia Insurance Guaranty Association Act [hereinafter "the Guaranty Act"].[17] In this regard, the Association argues that W. Va. Code § 33–26–12(1)[18] requires a claimant, including an insured, who asserts a claim against an insolvent insurer and who seeks payment of such claim from the WVIGA, to first ascertain whether there exists any other solvent insurer from whom to recover. If there is another solvent insurer, be it the claimant's insurer, another insurer of the insured, or the insurer of another defendant or tortfeasor, the Association contends that the claimant must first satisfy his/her claim from the solvent insurer's policy proceeds before he/she may request payment from the Association.

By contrast, the Hospital and Mrs. DeVane reject the Association's interpretation of W. Va.Code § 33–26–12(1) and maintain that this section merely requires a claimant to recover first from all policies of insurance which insure the exact same risk that was insured by the insolvent insurer. Whether there exists another policy of insurance does not matter unless it provides collateral coverage for the claim asserted against the insolvent insurer and, ultimately, against the WVIGA. In other words, the Hospital and Mrs. DeVane agree that if a claimant or an insured has insurance to cover the same risk of loss, these policies of insurance should be exhausted before resort is had to the WVIGA. However, they contend that if the only other solvent insurance policy available is held by another defendant or tortfeasor against whom a different claim is asserted, such insurance need not be exhausted before the claimant may recover from the WVIGA.

■ With this issue, we are asked to resolve a question of statutory interpretation. When determining the meaning of a statute, it is necessary first to determine what the Legislature intended when it drafted the provision in question. " 'The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syllabus point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 6, *State ex rel. ACF Indus., Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999). The legislative intent of a statute may be self-evident from the terms of the statute, itself, or such intent may be apparent from companion statutory enactments. *See* Syl. pt. 4, in part, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997) ("In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." (internal quotations and citations omitted)); Syl. pt. 2, in part, *Mills v. Van Kirk*, 192 W.Va. 695, 453 S.E.2d 678 (1994) ("To determine the true intent of the legislature, courts are to examine the statute in its entirety and not select 'any single part, provision, section, sentence, phrase or word.' Syllabus Point 3, in part, *Pristavec v. Westfield Ins. Co.*, 184

---

16. We appreciate the appearance of the various Amici Curiae in this proceeding and will consider their concerns in connection with the arguments of the parties whose interests they share.

17. The Guaranty Act encompasses those statutory provisions defining and establishing the West

Virginia Insurance Guaranty Association. *See* W. Va.Code § 33–26–1, *et seq.*

18. *See infra* page 18 for the text of W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996).

W.Va. 331, 400 S.E.2d 575 (1990).")". *See also* Syl. pt. 2, in part, *Beckley v. Kirk,* 193 W.Va. 258, 455 S.E.2d 817 (1995) ("Statutes in pari materia, must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect." (internal quotations and citations omitted)); Syl. pt. 3, *Boley v. Miller,* 187 W.Va. 242, 418 S.E.2d 352 (1992) (same).

■■■ Once the legislative intent of a statutory provision has been ascertained, the reviewing tribunal may proceed to a review of the language employed in drafting the statute. Where the language of a statutory provision is plain, its terms should be applied as written and not construed. Syl. pt. 5, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) ("Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." (internal quotations and citations omitted)); Syl. pt. 1, *State v. Jarvis,* 199 W.Va. 635, 487 S.E.2d 293 (1997) ("'A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951).").

■■■ In the case *sub judice,* the intent expressed by the Legislature in enacting the West Virginia Insurance Guaranty Association Act was clearly set forth in its statement of purpose. "The purpose of this article is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . . ." W. Va.Code § 33–26–2 (1970) (Repl. Vol.1996). To effectuate this purpose, the Legislature mandated further that "[t]his article shall be liberally construed to effect the purpose under section two [§ 33–26–2] of this article which shall constitute an aid and guide to interpretation." W. Va.Code § 33–26–4 (1970) (Repl.Vol.1996). Thus, it is evident that a primary intention of the Legislature in promulgating the Guaranty Act was the scrupulous protection of those having claims against insurers, which have been de-

clared insolvent, by facilitating and expediting the process of recovering monies due and owing on such claims.

When a claimant or an insured attempts to recover on a claim against an insolvent insurer, the claims of which have become the obligations of the WVIGA, the Act requires him/her to first exhaust other sources of solvent insurance before pursuing his/her claim against the WVIGA. The statute at issue herein, W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996), requires:

> Any person having a claim against a solvent insurer under any provision in an insurance policy other than a policy of an insolvent insurer, *which is also a covered claim,* shall be required to exhaust first his right under such solvent insurer's policy. Any amount payable on a covered claim under this article shall be reduced by the amount of any recovery under such solvent insurer's policy.

(Emphasis added). In ascertaining the meaning of this provision, it is necessary to refer to a companion statute in the Guaranty Act which clarifies the term "covered claim":

> "Covered claim" means an unpaid claim, including one for unearned premiums other than retrospective premiums or other premiums subject to adjustment after the date of liquidation, which arises out of and is within the coverage of an insurance policy to which this article applies and which policy is in force at the time of the occurrence giving rise to such unpaid claims if (a) the insurer issuing the policy becomes an insolvent insurer after the effective date of this article [May 12, 1970] and (b) the claimant or insured is a resident of this state at the time of the insured occurrence, or the property from which the claim arises is permanently located in this state. "Covered claim" shall not include (i) any amount in excess of the applicable limits of coverage provided by an insurance policy to which this article applies; nor (ii) any amount due any reinsurer, insurer, insurance pool or underwriting association, as subrogation recoveries or otherwise from an insolvent insurer or the insured of an insolvent insurer to the extent of coverage under the insured's policy.

W. Va.Code § 33–26–5(4) (1985) (Repl.Vol. 1996). Stated otherwise, the definition of "covered claim" contemplates a (1) claim [19] that is (2) unpaid; (3) "which arises out of and is within the coverage of an insurance policy," which (a) is "in force at the time of the occurrence giving rise to" the claim and (b) was issued by an insurer which became insolvent after May 12, 1970; and (4)(a) that is asserted by a claimant or insured who "is a resident of [West Virginia] at the time of the insured occurrence" or (b) that arises from property which "is permanently located in [West Virginia]." *See id.*[20]

■■■■ Reading the nonduplication of recovery provision with the definition of a "covered claim" suggests that before a claimant may enforce his/her insolvent insurer claim against the WVIGA, he/she must first pursue any claims he/she may have against solvent insurers which provide coverage for the covered claim asserted against the insolvent insurer and the WVIGA. Only after he/she has recovered the full amounts available from solvent insurers collaterally insuring the covered claim may he/she seek remuneration from the WVIGA. Thus, it may be logically inferred from the plain language of W. Va. Code § 33–26–12(1) that if no other solvent insurance applies to the covered claim asserted against the insolvent insurer, the claimant may proceed directly against the WVIGA as the requirements of § 33–26–12(1) have effectively been satisfied by the absence of applicable solvent insurance. Accordingly, we hold that when a claimant or an insured wishes to enforce a covered claim, as defined by W. Va.Code § 33–26–5(4) (1985) (Repl. Vol.1996), for insurance benefits against an insolvent insurer and to recover such insurance proceeds, as permitted by W. Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol.1996), from the West Virginia Insurance Guaranty Association, W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) requires him/her first to exhaust all other sources of solvent insurance which collaterally insure the covered claim. Once the claimant or insured has exhausted all other sources of solvent insurance which collaterally insure the covered claim or where there exists no other solvent insurance which provides coverage for the covered claim, he/she is entitled to enforce his/her covered claim against the West Virginia Insurance Guaranty Association, to the extent allowed by W. Va.Code § 33–26–8(1)(a) (1985) (Repl. Vol.1996).[21]

**19.** In the field of insurance, a "claim" signifies "an application or request for payment or benefits provided under an insurance policy." W. Va.Code § 33–41–2(c) (1997) (Supp.1998). *See also Atlas Underwriters, Ltd. v. Meredith–Burda, Inc.,* 231 Va. 255, 258, 343 S.E.2d 65, 67 (1986) (" 'Claim' contemplates the assertion of a legal right by a third person for damages caused by conduct of the named insured. It means a demand by one to whom a right has accrued for payment of a loss suffered due to acts of the insured that are covered by the policy.").

**20.** Based upon the definition of "covered claim" set forth in W. Va.Code § 33–26–5(4) (1985) (Repl.Vol.1996), it clearly appears that Mrs. De-Vane's claim arising from her pre-insolvency settlement agreement with ICA is a covered claim. This is so because Mrs. DeVane's claim is a (1) request for insurance benefits from ICA; (2) that is unpaid; (3) which arose out of Dr. Kennedy's alleged professional negligence which was covered by a policy of professional liability insurance with ICA and which policy (a) was in force on the date of the decedent's death and (b) was issued by ICA, an insurer which became insolvent after May 12, 1970; and (4) that is asserted by Mrs. DeVane, who was a West Virginia resident at the time of her husband's death. *See id.*

**21.** Our interpretation of W. Va.Code § 33–26–12(1) is consistent with the decisions of other jurisdictions that have similarly interpreted nonduplication of recovery provisions contained in their insurance guaranty acts. *See, e.g., Zhou v. Jennifer Mall Restaurant, Inc.,* 699 A.2d 348 (D.C.Cir.1997); *Beukema v. Yomac, Inc.,* 284 Ill. App.3d 790, 219 Ill.Dec. 902, 672 N.E.2d 755 (1996); *Insurance Comm'r of Md. v. Property & Cas. Ins. Guar. Corp.,* 313 Md. 518, 546 A.2d 458 (1988); *Harrow Stores, Inc. v. Hanover Ins. Co.,* 315 N.J.Super. 547, 719 A.2d 196 (1998); *Aztec Well Servicing Co., Inc. v. Property & Cas. Ins. Guar. Ass'n of N.M.,* 115 N.M. 475, 853 P.2d 726 (1993); *Medical Malpractice Joint Underwriting Ass'n of R.I. v. Rhode Island Insurers' Insolvency Fund,* 703 A.2d 1097 (R.I.1997); *Washington Ins. Guar. Ass'n v. McKinstry Co.,* 56 Wash.App. 545, 784 P.2d 190 (1990). *Cf. California Ins. Guarantee Ass'n v. Liemsakul,* 193 Cal.App.3d 433, 238 Cal.Rptr. 346 (1987); *Witkowski v. Brown,* 576 A.2d 669 (Del.Super.Ct.1989); *Hetzel v. Clarkin,* 244 Kan. 698, 772 P.2d 800 (1989); *Fishman v. Automotive Cas. Ins. Co.,* 643 So.2d 805 (La.Ct. App.1994); *Ventulett v. Maine Ins. Guar. Ass'n,* 583 A.2d 1022 (Me.1990); *Blackwell v. Pennsylvania Ins. Guar. Ass'n,* 390 Pa.Super. 31, 567 A.2d 1103 (1989); *Northland Ins. Co. v. Virginia Property & Cas. Ins. Guar. Ass'n,* 240 Va. 115, 392 S.E.2d 682 (1990). *But see, e.g., Oglesby v. Liberty Mut. Ins. Co.,* 832 P.2d 834 (Okla.1992).

Having gleaned the intent and meaning of W. Va.Code § 33–26–12(1), we must now address the WVIGA's argument that there may possibly exist solvent insurance against which Mrs. DeVane could assert her claim resulting from her settlement with Dr. Kennedy and his insurer before pursuing her claim against the WVIGA. In this regard, the WVIGA urges that the Hospital has a policy of insurance through Medical Assurance and that this policy may provide coverage for Dr. Kennedy's alleged professional negligence and for the Hospital's vicarious liability therefor. Though it is true that Mrs. DeVane is required to exhaust all policies of solvent insurance which provide coverage for her covered claim [22] against ICA, Dr. Kennedy's insurer, before resorting to the WVIGA for recompense, the record of this appeal does not indicate that there exist any other applicable policies of solvent insurance.

First, and foremost, as a result of the parties' settlement and consequent release, which effectively nullifies all of Mrs. DeVane's claims against all of the defendants to this action, no other parties are present in this lawsuit who could be called upon to tender their policies of insurance, provided they are applicable to this situation, in satisfaction of Mrs. DeVane's covered claim. To rule as the WVIGA suggests would completely obliterate and destroy the voluntary settlement agreement the parties reached prior to ICA's insolvency. Given the high esteem and great preference accorded settlements generally, as will be discussed further in Section III.B., *infra*, we cannot in good conscience set aside the voluntary resolution of this matter.[23]

Next, while the WVIGA maintains that the settlement need be set aside only insofar as it is necessary to reach the Hospital's policy of insurance, such a feat is not so facile as the Association would have this Court believe. In order to reach the Hospital's insurer, it is necessary to first find the Hospital at fault. *Robinson v. Cabell Huntington Hosp., Inc.*, 201 W.Va. 455, 459–60, 498 S.E.2d 27, 31–32 (1997) (" 'As a general rule, in the absence of policy or statutory provisions to the contrary, one who suffers injury which comes within the provisions of a liability insurance policy is not in privity of contract with the insurance company, and cannot reach the proceeds of the policy for the payment of his claim by an action directly against the insurance company.' " (quoting 46A C.J.S. *Insurance* § 1407, at 277 (1993) (footnote omitted))). Therefore, to find the Hospital at fault, the question of Dr. Kennedy's alleged professional negligence must be asked and answered. Syl. pt. 1, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991) ("Where a hospital makes emergency room treatment available to serve the public as an integral part of its facilities, the hospital is estopped to deny that the physicians and other medical personnel on duty providing treatment are its agents. Regardless of any contractual arrangements with so-called independent contractors, the hospital is liable to the injured patient for acts of malpractice committed in its emergency room, *so long as the requisite proximate cause and damages are present.*" (emphasis added)).

Thus, to pose and to decide these queries, it is necessary not only to set aside a mere portion of the settlement, as contended by the Association, but to litigate the entire foundation of facts upon which the settlement was based and which the settlement has quietly resolved. During the course of such litigation it is entirely possible that all of the requisite elements could be satisfied, and the Hospital's insurer, Medical Assurance, would be required to pay Mrs. DeVane's covered claim. However, in this world of uncertainties, it is equally as likely that Mrs. DeVane could lose the case entirely and be faced with

---

**22.** *See supra* note 20.

**23.** We acknowledge the WVIGA's concern about the propriety and equity of the settlement given the declaration of ICA's insolvency less than a month after its achievement. Nevertheless, it should be noted that the WVIGA had at its disposal numerous tools by which it could have contested the terms of this settlement. *See* W.

Va.Code § 33–26–8(1)(d) (1985) (Repl.Vol.1996) (permitting WVIGA to review settlements to which insolvent insurer was a party to ascertain challenges thereto); W. Va.Code § 33–26–18 (1985) (Repl.Vol.1996) (imposing mandatory six-month stay of proceedings to enable WVIGA to defend causes of action pending against insolvent insurer).

insurmountable legal fees. It is this contingency for which the WVIGA has not proffered a solution. We find it patently unfair to require Mrs. DeVane, who undoubtedly considered these and many other potential outcomes in making her decision to settle her lawsuit and release her claims against the defendants, to sacrifice the voluntary and final resolution of her litigation. We further find distasteful the WVIGA's failure to contemplate or account for this all-too-real potentiality given the Guaranty Act's explicit purpose of protecting claimants and policyholders of insolvent insurers. *See* W. Va. Code § 33–26–2. Therefore, we hold that when parties have voluntarily settled a lawsuit and the insurer charged with paying such settlement, who participated in such settlement negotiations, subsequently becomes insolvent, the exhaustion of solvent insurance provision contained in W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) does not automatically require the pre-insolvency settlement agreement to be set aside. Rather, in order to escape liability for a pre-insolvency settlement agreement based upon the existence of collateral solvent insurance applicable to the covered claim, the West Virginia Insurance Guaranty Association must contest the settlement, pursuant to W. Va.Code § 33–26–8(1)(d) (1985) (Repl.Vol.1996), by demonstrating the existence of such collateral insurance.[24]

■ Finally, even if the Hospital's Medical Assurance policy provided coverage under these circumstances, the sparse appellate record contains nary a trace of this policy to assist our review in this regard. Even though the record is replete with references to the Hospital's insurance, the very policy itself is conspicuously absent from the appellate record. It equally is doubtful whether the concerned parties presented the Medical Assurance policy to the circuit court for its consideration. We have held, on numerous occasions, that this Court's appellate review of a case is limited to the record presented to us on appeal: " '[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a

consideration of those matters passed upon by the court below and *fairly arising upon the portions of the record designated for appellate review.*' Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975)." Syl. pt. 2, *Trent v. Cook,* 198 W.Va. 601, 482 S.E.2d 218 (1996) (emphasis added). *Accord Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.,* 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996); *State v. Honaker,* 193 W.Va. 51, 56 & n. 4, 454 S.E.2d 96, 101 & n. 4 (1994); Syl. pt. 2, *State v. Bosley,* 159 W.Va. 67, 218 S.E.2d 894 (1975); Syl. pt. 5, *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897 (1966). With regard to the particular evidence missing from the appellate record herein, we have admonished that "the text of the applicable insurance coverages afforded, including any applicable contractual exceptions or limitations contained in the policies, should be included in the record at an early stage of the proceedings ...." *Parkulo v. West Virginia Bd. of Probation & Parole,* 199 W.Va. 161, 169, 483 S.E.2d 507, 515 (1996). If a matter is not adequately preserved in the record or has not been entered into the record during the proceedings below, we cannot find in the appellate record presented for our consideration evidence that simply does not exist. Hence, we decline further speculation as to whether the Hospital's policy of insurance provided collateral solvent insurance applicable to Mrs. DeVane's covered claim.

■ Furthermore, with the absence of the Hospital's insurance policy from the appellate record herein, the WVIGA's arguments that Medical Assurance provided coverage for Dr. Kennedy's professional negligence and/or the Hospital's vicarious liability attributable thereto are nothing more than mere conjecture. Without being able to read the language of this policy and to refer to its specific coverage provisions, the WVIGA's contention is specious and essentially calls upon this Court to decide an issue that is not properly before us. We have warned litigants that we will not decide purely hypothetical questions that lack an adequate factual basis in the appellate record.

**24.** We wish to emphasize that our decision of the instant appeal pertains solely to *pre-insolvency* settlement agreements and does not consider the validity or effect of *post-insolvency* settlements.

"Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes. The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken." *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont,* 126 W.Va. 183, 185–86, 27 S.E.2d 486, 487–88 (1943).

Syl. pt. 2, *Harshbarger v. Gainer,* 184 W.Va. 656, 403 S.E.2d 399 (1991). Therefore, we reject the WVIGA's arguments that the Hospital's Medical Assurance policy provides solvent insurance from which Mrs. DeVane should seek recovery because we have before us no indicia that such policy's coverage is indeed applicable to Mrs. DeVane's covered claim.[25]

## B. Enforcement of Pre-insolvency Settlement Agreement

In its second assignment of error, the WVIGA contends that the circuit court erred by enforcing the pre-insolvency settlement agreement against it. First, the WVIGA asserts that W. Va.Code § 33–26–8(1)(a)[26] specifically exempts the WVIGA from "stipulated judgment[s]" entered against an insolvent insurer. As we understand the argument advanced by the WVIGA, the Association interprets the circuit court's order enforcing the pre-insolvency settlement agreement to be a "stipulated judgment." Accordingly, the WVIGA maintains that, because it cannot be bound by stipulated judgments, the circuit court erred in ordering the settlement's enforcement against it. Next, the WVIGA argues that since it did not participate in the settlement negotiations attending the pre-insolvency settlement agreement entered into by Mrs. DeVane, Dr. Kennedy, and ICA, it cannot be bound by the terms of this agreement. Specifically, the WVIGA complains that it did not have an opportunity to review the terms of the settlement or to otherwise contest its enforcement.

Mrs. DeVane and the Hospital reject the WVIGA's assertions and insist that the circuit court did not err in enforcing the pre-insolvency settlement agreement against the WVIGA. First, they contend that the WVIGA is obligated to honor the terms of the settlement, which was entered into prior to ICA's insolvency, because, upon an insurer's insolvency and resultant liquidation, W. Va. Code § 33–26–5(5), the WVIGA steps into the shoes of the insolvent insurer and assumes the insurer's obligations and receives the benefit of the insurer's defenses, W. Va. Code § 33–26–8(1)(a–b) (1985) (Repl.Vol. 1996). Moreover, the Hospital and Mrs. DeVane reject the WVIGA's contention that it

---

**25.** The WVIGA also complains that if it is required to pay Mrs. DeVane's covered claim, instead of requiring her to first seek recovery from the Hospital's insurance policy, it will have fewer funds, from its already limited resources, with which to satisfy the multitude of medical malpractice insurance claims arising from ICA's and PIE's insolvencies. This argument is simply not convincing. The purpose of the WVIGA is to protect those individuals who have claims against insolvent insurers by facilitating and expediting their monetary recoveries. W. Va.Code § 33–26–2 (1970) (Repl.Vol.1996); *Cannelton Indus., Inc. v. Aetna Cas. & Sur. Co. of Am.,* 194 W.Va. 203, 207, 460 S.E.2d 18, 22 (1994). The WVIGA does not have as its raison d'être the conservation of its own financial reserves. *See Medical Malpractice Joint Underwriting Ass'n,* 703 A.2d at 1102 (adopting position that insurance guaranty associations "must refrain from acts that demonstrate greater concern for the [guaranty association's] monetary interest than the financial risk attendant to the insured's situation" (citation omitted)). Additionally, the provisions of the Guaranty Act specifically have con-

templated the inability of the Association to meet all of its obligations in a given year and have supplied various mechanisms to ensure the ultimate payment in full of all permissible covered claims. *See, e .g.,* W. Va.Code § 33–26–8(1)(c) (1985) (Repl.Vol.1996) (authorizing WVIGA to make prorated payments to claimants from future assessments if current WVIGA funds do not permit present satisfaction in full of claims and allowing Association to assess member insurers to ensure funding for WVIGA's operation and assumed obligations); W. Va.Code § 33–26–11 (1970) (Repl.Vol.1996) (requiring recipients of WVIGA monies to assign their rights under insolvent insurance policies to WVIGA and preserving Association's rights against liquidated estates of insolvent insurers).

**26.** W. Va.Code § 33–26–8(1)(a) (1985) (Repl.Vol. 1996) directs, in relevant part, "[n]otwithstanding any other provision of this article, ... no[ ] ... default judgment or stipulated judgment against the insolvent insurer ... [shall] be binding against the association."

had no opportunity to challenge the terms of the settlement based upon the Guaranty Act's mandatory six-month stay of proceedings "to permit proper defense by the association of all pending causes of action" involving the insolvent insurer, W. Va.Code § 33–26–18, which stay was granted in the underlying proceedings, and the Association's statutory right to "review settlements ... to which the insolvent insurer ... [was a] part[y] to determine the extent to which such settlements ... may be properly contested," W. Va.Code § 33–26–8(1)(d). Thus, Mrs. DeVane and the Hospital urge that the circuit court correctly enforced the pre-insolvency settlement agreement against the WVIGA and that it ruled consistently with the decisions of other jurisdictions that have addressed this same issue. *Citing Thornock v. Pack River Management Co.,* 790 F.Supp. 1014 (D.Mont.1990), *aff'd in part and rev'd in part sub nom. Thornock v. Washington Ins. Guar. Ass'n,* 942 F.2d 794 (9th Cir.1991) (enforcing settlement agreement against Guaranty Association); *Betancourt v. Arizona Property & Cas. Ins. Fund,* 170 Ariz. 296, 823 P.2d 1304 (Ct.App.1991) (enforcing pre-insolvency settlement agreement against Guaranty Association); *Lastie v. Warden,* 611 So.2d 721, 723 (La.Ct.App.1992) (rejecting Guaranty Association's asserted defense that it was not a party to the settlement agreement stating that Association "stand[s] in the shoes of an insolvent insurer").

In the alternative, Mrs. DeVane and the Hospital contend that the WVIGA cannot raise on appeal the propriety of the circuit court's enforcement of the pre-insolvency settlement agreement when it failed to raise this issue below. Because of its alleged untimely intervention, the Hospital and Mrs. DeVane argue that the WVIGA has waived any objections it may have had regarding the settlement's enforceability. *Citing Betancourt v. Arizona Property & Cas. Ins. Fund,* 170 Ariz. 296, 823 P.2d 1304 (enforcing obligations arising under pre-insolvency settlement agreement against Guaranty Association); *Mississippi Ins. Guar. Ass'n v. Byars,* 614 So.2d 959 (Miss.1993) (finding Guaranty Association waived right to deny coverage where, despite having received timely notice,

Association failed to attend settlement conference).

We begin our discussion of this issue by reiterating, at the outset, that settlements are highly regarded and scrupulously enforced, so long as they are legally sound. "The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Syl. pt. 1, *Sanders v. Roselawn Mem'l Gardens,* 152 W.Va. 91, 159 S.E.2d 784 (1968). The esteem with which settlements are viewed is evident also in the language of the Guaranty Act. Rather than automatically abrogating all settlements entered into by insurers prior to their insolvency, thereby resolutely relieving the WVIGA of these obligations, the Guaranty Act impliedly recognizes the validity of these voluntary agreements by absolving. the Association's liability therefor only insofar as such agreements "may be properly contested." *See* W. Va.Code § 33–26–8(1)(d).

In the absence of specific grounds of contestableness delineated in the Guaranty Act, it is apparent that the challenges which the WVIGA may raise to the enforceability of a pre-insolvency settlement agreement are the same as those that the insolvent insurer would have been able to assert but for its insolvency. *See* W. Va.Code § 33–26–8(1)(b) (*"The association* shall ... [b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent *shall have all* rights, duties, *defenses* and obligations *of the insolvent insurer as if the insurer had not become insolvent."* (emphasis added)). *See also* Syl pt. 4, *Smith v. State Workmen's Compensation Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (" 'That which is necessarily implied in a statute, or must be included in it in order to make the terms actually used have effect, according to their nature and ordinary meaning, is as much a part of it as if it had been declared in express terms.' *Syllabus* point 14., *State v. Harden,* 62 W.Va. 313, 58 S.E. 715 (1907).").

Given the preference accorded settlements generally, the party seeking to

avoid the operation of a settlement faces a heavy burden. "Where parties have made a settlement ..., such settlement is conclusive upon the parties thereto as to the correctness thereof in the absence of accident, mistake or fraud in making the same." Syl. pt. 1, in part, *Calwell v. Caperton's Adm'rs,* 27 W.Va. 397 (1886). *Accord* 15A Am.Jur.2d *Compromise and Settlement* § 27, at 799–800 (1976); 4A Michie's Jurisprudence *Compromise and Settlement* § 10, at 45 (Repl. Vol.1990). *Cf.* Syl. pt. 4, *Sanders,* 152 W.Va. 91, 159 S.E.2d 784 ("'A compromise of a doubtful question, either of law or fact, where fairly made between parties competent to contract, is binding and can not be affected by any subsequent investigation or result.' Point 4 Syllabus, *Davis v. Lilly,* 96 W.Va. 144[, 122 S.E. 444 (1924) ].'"). "A party to such settlement seeking to re-open the same on any of said grounds must distinctly allege and by clear and convincing evidence prove the particular facts, wherein such accident, mistake or fraud consists ...." Syl. pt. 3, in part, *Calwell,* 27 W.Va. 397. *See also* Syl. pt. 5, in part, *Smith v. Monongahela Power Co.,* 189 W.Va. 237, 429 S.E.2d 643 (1993) ("Settlements are presumptively made in good faith. A defendant seeking to establish that a settlement made by a plaintiff and a joint tortfeasor lacks good faith has the burden of doing so by clear and convincing evidence.... [A] settlement lacks good faith only upon a showing of corrupt intent by the settling plaintiff and joint tortfeasor, in that the settlement involved collusion, dishonesty, fraud or other tortious conduct.").

 For the WVIGA to escape liability for ICA's obligations arising from its settlement agreement with Mrs. DeVane, it must demonstrate that the agreement was achieved through accident, mistake, or fraud. From our review of the WVIGA's arguments, we conclude that it has failed to satisfy its burden and that the circuit court did not abuse its discretion in enforcing the pre-insolvency settlement agreement against the WVIGA.

 The WVIGA's first contention, that it is protected from the settlement's enforcement by the terms of W. Va.Code § 33–26–8(1)(a), is untenable. In pertinent part, W. Va.Code § 33–26–8(1)(a) states that, in addition to other prohibited claims, "nor shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of an insolvent insurer, be binding against the association." To escape liability for the settlement agreement under this statutory provision, then, the WVIGA must demonstrate that the circuit court's order enforcing the agreement amounted to either a "default judgment" or a "stipulated judgment." It is clear from the record of the underlying proceedings that the enforcement order was not in the nature of a default judgment. *See* Black's Law Dictionary 842 (6th ed.1990) (defining "default judgment" as "[a] judgment rendered in consequence of the non-appearance of the defendant"). *See also* W. Va. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules, and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default.").

· Likewise, the circuit court's order enforcing the pre-insolvency settlement agreement did not constitute a stipulated judgment. While the judgment order entered by the circuit court enforced a voluntary settlement agreement between the parties, it is not truly a "stipulated judgment" within the ordinarily accepted meaning of this term. *See* Syl. pt. 5, in part, *Hosaflook v. Consolidation Coal Co.,* 201 W.Va. 325, 497 S.E.2d 174 (1997) ("Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." (internal quotations and citations omitted)); Syl. pt. 3, in part, *Ohio Cellular RSA Ltd. Partnership v. Board of Pub. Works of W.Va.,* 198 W.Va. 416, 481 S.E.2d 722 (1996) ("In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning." (internal quotations and citations omitted)). A "stipulated judgment" is described as "[a] consent to the entry of the judgment." Ballentine's Law Dictionary 1236 (2d ed.1948). In the proceedings underlying this appeal, not only did the ·parties not agree that the

settlement agreement should be enforced by the circuit court, but Dr. Kennedy, who was represented by counsel for ICA, affirmatively opposed such enforcement. Consequently, the circuit court's order enforcing the settlement agreement was not a stipulated judgment and was not excluded from the insolvent insurer's obligations which the WVIGA, by operation of the Guaranty Act, was required to assume. *See* W. Va.Code § 33–26–8(1)(a).

[24] Next, the WVIGA contends that the pre-insolvency settlement agreement, entered into by Mrs. DeVane, Dr. Kennedy, and ICA, cannot be enforced against it because it was not a party to the settlement negotiations or resulting agreement. This argument also is unpersuasive. As discussed above, when an insurer becomes insolvent and undergoes liquidation, the WVIGA assumes all of the insolvent insurer's "obligation[s] on . . . covered claims" and receives the benefit of "all . . . defenses" enjoyed by such insurer prior to its insolvency. W. Va. Code § 33–26–8(1)(b). As such, the defenses to the enforcement of the settlement of which the WVIGA may avail itself are limited to those which the insurer could have asserted to escape liability for the agreement: accident, mistake, and fraud. *See* Syl. pt. 1, *Calwell v. Caperton's Adm'rs,* 27 W.Va. 397. The fact that the WVIGA was not a party to the settlement agreement was not a valid defense available to ICA and cannot now be asserted by the WVIGA, which has "stepped into the shoes" of the insolvent insurer.[27] Moreover, the WVIGA has neither argued that accident, mistake, or fraud tainted the parties' settlement agreement nor attempted to prove such malfeasance by clear and convincing evidence. *See* Syl. pt. 3, *Calwell,* 27 W.Va. 397. Therefore, the circuit court's order enforcing the settlement agreement cannot be set aside on these grounds.

■ Lastly, Mrs. DeVane and the Hospital have suggested that any complaints that the WVIGA may have regarding the enforcement of the settlement agreement against it were waived by its failure to earlier raise these issues before the circuit court. In reviewing this contention we hesitate to criticize unjustly considering the lack of formal notice given to the WVIGA. Our review of the record indicates that only twice did the WVIGA receive formal notice of the proceedings had in the circuit court. By order of the court, the WVIGA received a copy of the court's order imposing a six-month statutory stay of the proceedings and a copy of the court's order enforcing the parties' pre-insolvency settlement agreement, which order forms the basis of the instant appeal.

Even though counsel for the WVIGA admitted, during oral argument of the case before this Court, that it had knowledge of the various proceedings, we remain disturbed by the failure of counsel for Mrs. DeVane, Dr. Kennedy, and the Hospital to include the WVIGA in their lists of recipients for the motion to enforce settlement and the notice of hearing thereon. *See* W. Va. R. Civ. P. 5(a) (requiring service on parties of "every written motion other than one which may be heard ex parte, and every written notice") and 6(d) (delineating time periods within which motions and notices of motion hearings must be served). Our observations should, however, in no way be construed as condoning the actions of the WVIGA, which also had at its disposal the statutory authority to review and contest the settlement agreement and the opportunity to earlier intervene in the proceedings underlying this appeal. *See* W. Va.Code § 33–26–8(1)(d) (permitting WVIGA to review settlements in preparation for contest thereof); W. Va. R. Civ. P. 24(a) (authorizing intervention of right).

■ In other words, we cannot fault any one particular party for the lack of official notice upon the WVIGA and cannot, in good conscience, preclude its appeal based upon the perceived untimeliness of its intervention when the parties so complaining did not make an effort to ensure the WVIGA's pres-

---

27. Even though the WVIGA was not a party to the pre-insolvency settlement agreement, the Guaranty Act nevertheless provides protection for the WVIGA under such circumstances. *See* W. Va.Code § 33–26–8(1)(d) (allowing WVIGA to "review settlements . . . to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements . . . may be properly contested").

ence before the court or to enable it to protect its varied interests. Therefore, in an effort to ensure the formal notification of all parties interested in matters concerning insolvent insurers and in order to preserve an adequate record of such proceedings, we hold that when pleadings, motions, or notices are filed or other proceedings are conducted which impact the rights, duties, interests, and obligations of an insolvent insurer whose obligations have been assumed by the West Virginia Insurance Guaranty Association, formal notice of such pleadings, motions, notices, or proceedings shall be served upon the Association.

## IV.

## CONCLUSION

For the foregoing reasons, we conclude that the Circuit Court of Jefferson County did not err in enforcing against the WVIGA the pre-insolvency settlement agreement entered into by Mrs. DeVane, Dr. Kennedy, and ICA. W. Va.Code § 33–26–12(1) (1970) (Repl.Vol.1996) requires the exhaustion of all solvent insurance which provides coverage for the covered claim asserted against the Association. As discussed above, because there is no other solvent insurance available in this case to satisfy Mrs. DeVane's claim against ICA, the circuit court properly enforced the parties' settlement agreement and ordered the WVIGA to pay this claim. In addition, we find that the circuit court did not abuse its discretion in enforcing the pre-insolvency settlement agreement against the WVIGA because the Association has failed to assert any defenses which would enable it to escape such liability. Accordingly, the January 21, 1998, order of the Circuit Court of Jefferson County is affirmed.

Affirmed.

Justice MAYNARD dissents.